[No. 33654. *En Banc.* August 15, 1957.]

CROTON CHEMICAL CORPORATION, *Appellant,* v.
BIRKENWALD, INC., *Respondent.*[1]

*Alexander Wiley,* for appellant.

*Moriarty, Olson & Campbell,* for respondent.

MALLERY, J.—In 1951, the defendant ordered seventy-five barrels of curing salt for resale by it to meat packers. It specified that the salt should be manufactured for it by the plaintiff and contain eighty-five per cent sodium chloride, twelve per cent sodium nitrate, and three per cent sodium nitrite. The plaintiff filled the order, packed it in fiber drums, and delivered it f. a. s. (free alongside ship) in New York. It was shipped to Seattle via the Panama Canal and arrived in Seattle in December, 1951.

The defendant's customers began returning orders filled by it because the salt was caked "like cement." The meat packers need a "free flowing" salt.

Negotiations between the parties to settle the matter came to nothing. Plaintiff then sought a judgment for the

[1]Reported in 314 P. (2d) 622.

purchase price in the amount of $1,518.75. The defendant relies on a breach of implied warranty.

█ When goods are shipped f. a. s., the consignor is relieved of liability from causes of damage arising after delivery of the goods to the ship dock. *Lord v. Edwards*, 148 Mass. 476, 20 N. E. 161, *Tex-O-Kan Flour Mills Co. v. Nord*, 18 So. (2d) (La. App.) 50.

This case presents only this question of fact: What caused the salt to become hard and unusable?

The plaintiff seller produced competent evidence to prove that the moisture, which caused the hygroscopic chemicals to harden, was drawn from the moist tropical air encountered in the Panama route of shipment.

The defendant, on the other hand, produced competent testimony to prove that the moisture content of the materials at the time of manufacture caused the salt to harden and breached the implied warranty of fitness for meat curing.

█ The court had the right to believe either theory, since both are adequately supported by competent evidence. The court chose to believe the defendant's theory and entered judgment accordingly. The plaintiff appeals.

RCW 4.44.060, Rem. Rev. Stat., § 368, provides, *inter alia*:

". . . The finding of the court upon the facts shall be deemed a verdict, and may be set aside in the same manner and for the same reason as far as applicable, . . ."

█ Since the court's findings and judgment are supported by the record, we will not overturn them.

The judgment is affirmed.

HILL, C. J., ROSELLINI, FINLEY, WEAVER, and FOSTER, JJ., concur.

SCHWELLENBACH, J. (dissenting)—Article IV, § 4, of the state constitution provides: "The supreme court shall have . . . appellate jurisdiction in all actions and proceedings, . . ." It is our duty to review the claimed errors of the trial court, whether of law or of fact. We have no right to abdicate that responsibility and make the trial judge *su-*

*preme* as to questions of fact. To do so, would not be fair to litigants. It would not be in accord with the purpose of appellate review. Of course, we should not place ourselves on the trial bench. We should not substitute our judgment for that of the trial judge. However, if the record clearly preponderates against the findings of the trial judge, it is our duty, as an appellate court, to reverse. I believe that that is the situation here.

Now what are the facts? We have this situation: Curing salt was ordered according to certain specifications. It was manufactured and ground according to those specifications. It was shipped via the Panama Canal. When it arrived in Seattle, it was solidly caked. If it became caked during and as a result of the trip, the seller would not be liable. If it became caked as a result of faulty manufacture, the seller would be liable.

The court entered Finding of Fact No. VI:

"That this caking was due entirely to the presence of excessive moisture in the meat-curing salt, that this excessive moisture was in the salt when it was packaged by plaintiff, that no hazard of the sea while the salt was in transit caused this caking, and that the salt became caked and hardened as a result of the plaintiff improperly putting the damp salt in the containers at the plaintiff's place of business."

Thomas H. Williams, a chemist, testified for respondent. His examination was made two and a half years after the salt was delivered. He explored half way down the barrel to get his samples, which he took at the center and at the edge. By comparison of the moisture content of other salts with that of the Croton salt, he concluded that the latter is not a hygroscopic salt. He defined "hygroscopic" as the tendency of salt to draw moisture out of the air. He testified that the uniformity of moisture from the edge to the center indicated that the drum was not accidentally wetted at any time because under that circumstance, the edge would have been more moist than the center; that the uniformity of the moisture content indicated that the salts had been that way all the time, and he concluded that they were moist

when they were ground. He pulverized the salt loosely, not destroying the grain size, and put it in a container. Within twenty-four hours it had caked again. He concluded therefrom that the moisture content was responsible for the caking.

H. W. Dippel, a chemist in New York, testified for the appellant by deposition. He testified that in a powder grind mix of three per cent sodium nitrite, twelve per cent sodium nitrate, and eighty-five per cent sodium chloride, there is a great tendency to harden, cake, or solidify; that all three of these chemicals are hygroscopic; that it is a common occurrence for such chemicals to harden when mixed in these proportions; that in transportation by ship through a very moist tropical country, such as Panama, there would be every opportunity for the salt to harden; that the fact that the salt caked solidly, from one edge of the drum to the other, would not indicate anything particularly; that the moisture could have been acquired one day and could have dried out the next day. He testified that the reason a portion of the particular mix remained in Metuchen, New Jersey, where it was originally mixed, remained free flowing, was because it did not undergo the same temperature and atmospheric conditions which the actual shipment did.

It would be rather presumptuous for us to attempt to distinguish the testimony of these two expert chemists, of a technical nature, and determine therefrom whether or not the salt contained excessive moisture at the time it was packaged.

However, we do have the additional testimony of Frank L. Morgan, the plant manager for Davies Nitrate Company, which prepared the order for Croton. He testified by deposition that the Birkenwald order was prepared on October 19, October 24, and October 30, 1951, and was picked up by carrier November 16th; that he examined the drums a day or two before they were shipped and that the material was perfectly usable—free flowing. He testified that they still have some 216 pounds on hand that was made for this particular order and that it is still very far from being hard; that it is quite soft.

Viewing all of the evidence, I am of the opinion that the defendant failed to sustain the burden of proving that the excessive moisture was in the salt when it was packaged by plaintiff, and that the evidence clearly preponderates against the findings of the trial court.

The judgment should be reversed and remanded with direction to grant judgment for the plaintiff.

DONWORTH and OTT, JJ., concur with SCHWELLENBACH, J.

November 26, 1957. Petition for rehearing denied.