[No. 42470. En Banc. July 19, 1973.]

EASTLAKE COMMUNITY COUNCIL et al., *Appellants*, v.
ROANOKE ASSOCIATES, INC., et al., *Respondents*.

476

*MacDonald, Hoague & Bayless*, by *Harold H. Green*, *Slade Gorton, Attorney General, Charles B. Roe, Jr., Robert V. Jensen*, and *Wick Dufford, Assistants*, for appellants.

*Lycette, Diamond & Sylvester*, by *Robert E. Ratcliffe*, for respondent Roanoke Associates, Inc., et al.

*A. L. Newbould, Corporation Counsel*, and *Gordon F. Crandall, Assistant*, for respondent Seattle.

*Ostrander, Van Eaton, Thomas & Ferrell*, by *Ralph I. Thomas*, and *Robert W. Graham*, amici curiae.

UTTER, J.—The plaintiffs[1] brought this action to enjoin the construction of a 128-unit, 5-story condominium apartment building on lots 1 through 8, block 52 of Lake Union Shorelands in Seattle. Defendants were Roanoke Reef Associates, the developer, and the City of Seattle and superintendent of buildings thereof, who issued building permits for the Roanoke Reef condominium.[2]

---

[1] The plaintiffs in this case are two nonprofit corporations (Eastlake Community Council, Inc. and Floating Homes Association, Inc.) who initiated this suit on behalf of themselves, their members and the public, and the State of Washington, as an intervenor, through the Attorney General and the Department of Ecology. Since the plaintiffs' briefs are so interrelated and the issues raised therein were by granted motion incorporated all within a single pleading, we need not decide the standing and laches arguments by the defendants, as the state is not challenged in either regard.

[2] Roanoke Reef Associates is a general partnership that succeeds to an earlier partnership, E. T. Hinrichs & Associates, both of which have been involved with the building project under attack. Roanoke Reef Associates will hereinafter be referred to as defendant and shall in-

Plaintiffs make five contentions: (1) the building permit for the condominium was issued in violation of the Seattle building code and zoning ordinances; (2) the grant of the second renewal of the building permit was unlawful as being arbitrary and capricious; (3) the grant of the third renewal of the building permit was unlawful as no environmental impact statement was prepared or issued in accordance with the State Environmental Policy Act of 1971 (SEPA) (RCW 43.21C); (4) the defendant-developer failed to obtain the permit required by the Shoreline Management Act of 1971 (RCW 90.58) prior to undertaking their substantial development; and (5) the building being constructed is an obstruction to navigation. We will discuss these contentions separately.

After a trial involving disputed testimony, the court declined to grant an injunction and entered judgment for the defendants. The court held the issuance of the May 8, 1969 building permit "although done contrary to the terms of the Building Code" was cured by subsequent compliance with the code requirements, and against the plaintiffs' remaining contentions.

Plaintiffs on appeal raise the same issues they urged before the trial court. We agree with plaintiffs that the building permit was issued in violation of the Seattle building code, that this irregularity was not cured by subsequent compliance and that, as well, even if the permit issuance was valid, an environmental impact statement was required prior to the third renewal of the building permit.

In 1967, defendant purchased lots 1 through 8 in Roanoke Bay of Lake Union, which then contained a boat marina comprising 60 covered boat moorages and a boat sales and repair shop. On June 19, 1967 the defendant applied to the City of Seattle for a building permit to construct a condominium. This application used state-leased submerged lands adjacent to the lots owned by defendant to satisfy the bulk and density requirements under the city zoning ordinance.

clude all partners, past and present. All other defendants will be mentioned by name when pertinent in this opinion.

This lease was not executed to them by the state until March 22, 1968.

On January 3, 1969 the 1967 application was reintroduced using the earlier application form, apparently to avoid forfeiting the previous plan checking fee. No new drawings or specifications were submitted with this "new" application as required by Seattle code 3.03.020. On May 7 or 8, 1969 the completed plans required by the code were filed and on May 8, 1969 a building permit (No. 531945) was issued "subject to structural and ordinance check." Such a conditional permit grant procedure was not and is not provided for by the Seattle code and the trial court concluded the May, 1969 permit was issued contrary to the code's terms.

Effective September 5, 1969 the Seattle zoning ordinance was amended to prohibit the use of submerged state-leased lands for computing floor area ratio, dwelling unit ratio and lot coverage. Such lands were so used by defendant in its 1967 and 1969 applications and in the city's 1969 conditional permit issuance.

On April 22, 1970 the first renewal of the 1969 permit was issued for 1 year.[3]

Another significant Seattle zoning ordinance amendment became effective on May 30, 1970 which provided that city council approval was required in the construction of an apartment house in a general commercial (CG) zone. The subject area is CG zoned and the condominium here received no such council approval.

On October 22, 1970 the superintendent of buildings ap-

---

[3]Seattle building code 3.03.020(h) provides as follows: "EXPIRATION. Permits and renewed permits shall expire one year from date of issue, except as otherwise specified. Original permits shall be renewed by the superintendent of buildings for one year upon application within the thirty day period immediately preceding the date of expiration. Renewed permits may be further renewed upon application within the thirty day period immediately preceding the date of expiration thereof, provided that the work permitted has been started and is progressing at a rate approved by the superintendent of buildings. Where conditions require, the superintendent of buildings may, as he deems necessary, issue nonrenewable permits which shall expire within a period less than one year from date of issue."

proved the building plans for the condominium by removing the condition "subject to structural and ordinance check" on the permit issued May 8, 1969. It was the removal of this condition which finally permitted the defendant, for the first time, to commence construction. Based on extensive and disputed testimony, the trial court found that work did commence on March 15 and 16, 1971 with the demolition of a portion of the moorage improvements on the subject property and the driving of 10 steel pipe piles.

On April 19, 1971 the second renewal of the original May 1969 permit was issued for a 6-month period, after the building superintendent determined, pursuant to code requirements, the work authorized had been started and was progressing at an approved rate.

The Shoreline Management Act of 1971 became effective on June 1, 1971 and the State Environmental Policy Act of 1971 (SEPA) became effective on August 9, 1971.

On October 17, 1971 the third renewal of the 1969 permit was issued for 1 year.

I

BUILDING PERMIT ISSUED IN VIOLATION OF CODE AND
ZONING ORDINANCES

The plaintiffs first contend the trial court erred in holding the defendant has a vested right to develop the property in accordance with the zoning ordinances in effect on January 3, 1969, the date of permit application. We agree.

■ Our ruling in *Hull v. Hunt*, 53 Wn.2d 125, 331 P.2d 856 (1958) sets forth this jurisdiction's rule as to when rights vest with an applicant for a building permit. We there expressly rejected, at page 129, the majority rule which states:

any substantial change of position, expenditures or incurrence of obligations under a permit entitles the permittee to complete the construction and use the premises for the purpose authorized irrespective of subsequent zoning or changes in zoning. . . . 8 McQuillin on Municipal Corporations (3d ed. 1949), § 25.157 at 360.

Illustrative of jurisdictions which adopt this rule is Vir-

ginia, where in *Board of Supervisors v. Medical Structures, Inc.*, 213 Va. 355, 192 S.E.2d 799 (1972), the court held, at page 358:

> where, as here, a special use permit has been granted under a zoning classification, a bona fide site plan has thereafter been filed and diligently pursued, and substantial expense has been incurred in good faith before a change in zoning, the permittee then has a vested right to the land use described in the use permit and he cannot be deprived of such use by subsequent legislation.

We rejected that approach at page 130 of *Hull*, where we noted:

> We prefer not to adopt a rule which forces the court to search through (to quote from *State ex rel. Ogden v. Bellevue, supra* [45 Wn.2d 492, 275 P.2d 899 (1954)]) "the moves and countermoves of . . . parties . . . by way of passing ordinances and bringing actions for injunctions"—to which may be added the stalling or acceleration of administrative action in the issuance of permits—to find that date upon which the substantial change of position is made which finally vests the right.

The rule we adopted is concise and provides for easy application. It is:

> [T]he right vests when the party . . . applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.

Therefore, no rights may vest where either the application submitted or the permit issued fails to conform to the zoning or building regulations.

The Seattle building code sets forth specific and extensive requirements for the orderly and equitable issuance of building permits. 3.03.020. The provisions therein, provide in part, that (a) to obtain a permit an application must be filed and accompanied by drawings and specifications; (b) *each* application is to have two sets of drawings and specifications; (c) the application and materials filed "shall be

checked by the Superintendent of Buildings"; (d) "If the Superintendent of Buildings is satisfied" that the application and materials conform to the law and a building permit fee has been paid "he shall issue a permit therefor to the applicant"; and (e) when a permit has been issued the drawings and specifications are to be marked "Approved".

■ The record indicates, and the trial court found, that the building permit of May 8, 1969 was issued contrary to these provisions in that the permit grant was made prior to any check of the drawings or specifications. In fact, the grant made was explicitly a conditional permit, which is not authorized by the code.

We have held that:

> The acts of administering a zoning ordinance do not go back to the questions of policy and discretion which were settled at the time of the adoption of the ordinance. *Administrative authorities are properly concerned with questions of compliance with the ordinance,* not with its wisdom.

(Italics ours.) *State ex rel. Ogden v. Bellevue,* 45 Wn.2d 492, 495, 275 P.2d 899 (1954). This rule is of equal force in the administration of a building code. To permit another course of administrative behavior, thereby inviting discretion, may well result in violations of the equal protection of the laws. The code is positive in its requirements and contains no exceptional procedures like those employed here; hence, no city officer was authorized to permit its violation. The duty of those empowered to enforce the codes and ordinances of the city is to insure compliance therewith and not to devise anonymous procedures available to the citizenry in an arbitrary and uncertain fashion.

This permit grant violation alone frustrates the vesting of defendant's rights, but there were also apparent inconsistencies regarding the applications to which no trial court findings were made. The code requires *each* application to have drawings and specifications submitted at the same time, yet here the "reintroduced" application was not accompanied by any new materials. It might be argued that

the 2-year-old drawings and specifications from the 1967 application can be deemed to satisfy this code requirement as they remained on file, but this raises the code provision pertaining to retention of drawings which provides:

> Drawings submitted for checking, for which no permit is issued, and on which no action is taken by the applicant for six months, shall be destroyed . . . to renew action on said drawings, new drawings and a payment of a new drawing check fee shall be required.

The record is clear that no permit was issued on the 1967 application and drawings; however, the record is unclear whether the applicant was idle for any 6-month period between the June 1967 application and the reintroduced January 1969 application. If no action was undertaken by the applicant, it was incumbent upon the building department to destroy the drawings and require new fee, application, and materials in order to renew a permit request.

Since the permit grant itself was patently impermissible, we need not decide if the application was also defective.

The trial court deemed this unlawful permit was immaterial because it was cured by "subsequent compliance". We decline to accept this validation of an otherwise invalid permit because there is no such curing device in the Seattle building code. Moreover, we must speculate as to what was the "subsequent compliance", presumably the October 22, 1970 removal of the permit's condition.

To the contrary, where a building permit is found to be invalid it is void and confers no rights. *Nolan v. Blackwell,* 123 Wash. 504, 212 P. 1048 (1923); *Hull v. Hunt,* 53 Wn.2d 125, 331 P.2d 856 (1958); *Steele v. Queen City Broadcasting Co.,* 54 Wn.2d 402, 341 P.2d 499 (1959). In both *Nolan* and *Steele* a primary deficiency in the permit was caused by errors on the part of the property owners, yet the officers and agents of the city were also causes for the unlawfulness of the permit issuance. In *Nolan,* the permit was issued under an error of fact by the officials. Regardless of the source of the invalidity, be it solely the wrongdoing of the applicant, the administrator, or both, the evil is identi-

cal; namely, the disregard of legislation established to further a social good. In *Steele,* the court found the city had no authority to issue the permit or keep it alive by granting extensions.

To ignore these mandatory code requirements is not only improper under the reasoning of *Nolan* and *Steele,* but would also seriously undermine, if not demolish, the protections of the rule established in *Hull v. Hunt, supra.* In the pursuit of certainty in the date of vesting of rights, we recognized our rule in *Hull* might invite speculation in building permits, but felt two factors diminished this possibility. First, a 180-day time limitation existed under the Seattle code within which construction must commence or a permit would become null and void. Second, the cost of preparing plans and meeting the requirements of building codes is such that good faith application can be assumed. The first factor is no longer the law in the Seattle code and so we must rely solely upon the burdens of meeting the pertinent building code requirements as the device for insuring the proper exercise of the *Hull* rule. Ignoring the violations here removes the code's burdens, inviting speculation.

■ The defendant urges us to look away from these code violations and provide equitable relief but fails to cite any legal or equitable principles to support the claim. This arbitrary approach must be avoided and we should not excuse the application of established codes and ordinances. Equitable relief is usually only appropriate where there are two private parties in dispute within a contractual or propertied relationship.[4] This is not the case here. *Finch v. Matthews,* 74 Wn.2d 161, 443 P.2d 833 (1968).

We cannot find that a litigant has any right to be a beneficiary of unlawful administrative conduct where the public's interest will suffer, by the mere assertion that extensive financial investment is in the balance. Defendant

[4] R. Newman, *Equity and Law: A Comparative Study* (1961); 2 J. Pomeroy, *A Treatise on Equity Jurisprudence* (5th ed. S. Symons 1941).

started the project with full awareness that there were multiple, serious legal obstacles and cannot now claim relief simply because money was expended in the face of an awareness it might not have a legal right to proceed.

We have not been persuaded in the past that because a financial investment is in jeopardy, the public interest should suffer. *Wilbour v. Gallagher,* 77 Wn.2d 306, 462 P.2d 232, 40 A.L.R.3d 760 (1969) and *Bach v. Sarich,* 74 Wn.2d 575, 445 P.2d 648 (1968).

In *Bach,* at page 581, we recognized that "[f]rom the very commencement of defendants' construction they were aware of the protests of other riparian owners. The encroaching structure did not exist at the time of suit, but was built during the pendency of this suit." In that case we refused to consider equitable relief premised upon the money expended during litigation.

Litigation here commenced with the filing of complaints on September 20, 1971, yet the developers assert on appeal that construction continues. Factually, in the instant case we are faced, at the time litigation commenced, with construction no further advanced than the fill, concrete slab and pilings in *Bach.*

The issue of whether defendant can comply with the now existing laws is not before us, nor is the question of what is to be done with the existing construction.

"Equity came to fulfil the law, not to destroy it" and we fail to see how the legal principles here at issue are fulfilled by excusing their application. L. Curzon, *Equity* 6 (1967).

Another reason exists to reject the theory that the May 1969 permit is unlawful, yet made valid by the October 1970 approval. If the 1969 permit is invalid, what is to be made of the permit renewals of April 1970, April 1971 and October 1971? It is nonsensical to argue that one can have a valid renewal of an invalid permit and the subsequent renewals of that invalid permit are also improper. If the October 1970 approval, by removing the condition on the permit is deemed an independent and lawful "permission" to construct, there still have been no renewals triggered by

that approval and based on that date because no one looked at that action as establishing a valid, lawful permit as of that date. No consistent argument can be made for the vesting of rights on an invalid permit allegedly cured by a subsequent event under a code which does not allow for any such curing.

## II
### Second Renewal of the Building Permit Was Not Unlawful as Being Arbitrary and Capricious

Assuming the second and third renewals of the May 1969 building permit are valid, we turn to a consideration of the issues raised in relation to them. The plaintiffs contend that the building superintendent acted arbitrarily and capriciously in granting the second renewal permit. We disagree.

█ Arbitrary and capricious administrative action is defined as:

[B]eing willful and unreasoning action, without consideration and in disregard of facts or circumstances . . . where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration, even though it may be otherwise felt that a different conclusion might be reached.

*Bishop v. Houghton*, 69 Wn.2d 786, 794, 420 P.2d 368 (1966). The discretion to which the abuse is asserted is authorized by Seattle code 3.03.020 (h) which provides that renewed permits after the initial renewal may be granted "provided that the work permitted has been started and is progressing at a rate approved by the superintendent of buildings."

█ The trial court found no abuse of discretion and the record supports such a finding. The record indicates considerable deliberation and time in coming to a decision. The investigation entailed a report from the superintendent's chief inspector, photographs taken of the site by a department inspector, the inspector's filed report, a visitation to the site by the superintendent of buildings, a meeting with the developer, information obtained indicating adequate and proper project financing, and information that pur-

chase orders for materials had been released. Though there may be room for debate as to whether the work had sufficiently progressed under the circumstances to justify the granting of the second renewal, where the trial court's findings are supported by substantial evidence, we will not overturn them. *Croton Chem. Corp. v. Birkenwald,* 50 Wn.2d 684, 314 P.2d 622 (1957); *Stringfellow v. Stringfellow,* 56 Wn.2d 957, 350 P.2d 1003, 353 P.2d 671 (1960), and cases cited therein; *Sheldon v. Hallis,* 72 Wn.2d 993, 435 P.2d 988 (1967).

## III

THIRD RENEWAL OF THE BUILDING PERMIT WAS UNLAWFUL AS NO ENVIRONMENTAL IMPACT STATEMENT WAS PREPARED OR ISSUED

It is also contended that the superintendent of buildings failed in his duty in regard to the third renewal by neglecting to file an environmental impact statement pursuant to SEPA, RCW 43.21C. We agree.

The settled law regarding application of environmental protection acts to the facts in this case requires that we find the city should have commenced environmental evaluation of the project's impact prior to the third renewal. *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 449 F.2d 1109 (D.C. Cir. 1971); *Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dep't,* 446 F.2d 1013 (5th Cir. 1971), *cert. denied,* 403 U.S. 932, 29 L. Ed. 2d 711, 91 S. Ct. 2257 (1971); *Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323 (4th Cir. 1972); Note, 39 Tenn. L. Rev. 735 (1972).

To do otherwise would be to not only ignore precedents already established but to also ignore the unusually vigorous statement of legislative purpose contained in this act to consider the total environmental and ecological factors to the fullest in deciding major matters.

The particular question raised by the assertion that SEPA embraces the Roanoke Reef project is whether the decision by the building department to issue a third re-

newal permit for such a project constitutes a major action significantly affecting the quality of the environment so as to require a detailed environmental impact statement. RCW 43.21C.030.

In this case, the necessity of an environmental impact statement is mandated by an analysis of SEPA and a review of *Stempel v. Department of Water Resources,* 82 Wn.2d 109, 508 P.2d 166 (1973) in which we first construed SEPA, and those leading federal cases interpreting the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321, *et seq.*).[5]

It is undisputed that (a) no environmental impact statement (RCW 43.21C.030(c)) has ever been prepared on the project at any stage of governmental action relating to the project; (b) the Roanoke Reef project and the governmental actions permitting its continuance significantly affect the environment; and (c) a governmental action related to the project (the October 19, 1971 renewal) did take place after the effective date of SEPA and the Roanoke Reef project was ongoing before the act's effective date (August 9, 1971).

The facts of this case do not present the retroactive

---

[5]Since much of the language from SEPA is taken verbatim from NEPA (signed into law January 1, 1970), we look when necessary to the federal cases construing and applying provisions of NEPA for guidance. Compare:

| | |
|---|---|
| RCW 43.21C.010 | and 42 U.S.C. § 4321 |
| RCW 43.21C.020(1) | and 42 U.S.C. § 4331(a) |
| RCW 43.21C.020(2) | and 42 U.S.C. § 4331(b) |
| RCW 43.21C.020(3) | and 42 U.S.C. § 4331(c) |
| RCW 43.21C.030(a) | and 42 U.S.C. § 4332(2)(A) |
| RCW 43.21C.030(b) | and 42 U.S.C. § 4332(2)(B) |
| RCW 43.21C.030(c)(i-iv) | and 42 U.S.C. § 4332(2)(C)(i-iv) |
| RCW 43.21C.030(d) | and 42 U.S.C. § 4332(2)(C)(v) |
| RCW 43.21C.030(e) | and 42 U.S.C. § 4332(2)(D) |
| RCW 43.21C.030(f) | and 42 U.S.C. § 4332(2)(E) |
| RCW 43.21C.030(g) | and 42 U.S.C. § 4332(2)(F) |
| RCW 43.21C.030(h) | and 42 U.S.C. § 4332(2)(G) |
| RCW 43.21C.040 | and 42 U.S.C. § 4333 |
| RCW 43.21C.050 | and 42 U.S.C. § 4334 |
| RCW 43.21C.060 | and 42 U.S.C. § 4335 |

application of SEPA because a major action triggering the act's application exists after SEPA's effective date. If no major action existed after the effective date of SEPA, we would then be faced with the retroactivity question. In this case, we have a single project—the Roanoke Reef condominium—with multiple stages of governmental action approving the project by permit issuance and their renewal. Some of the actions occurred before the act's effective date and one occurred after. *See* Note, 69 Mich. L. Rev. 732 (1971). The action occurring after was the permit renewal, which is a major action requiring the prospective application of SEPA in this case.

■ Governmental agencies essentially affect the environment in two ways. First, they may, as part of their regulatory functions, grant permits or licenses to private parties who in turn develop projects affecting the environment. *Stempel v. Department of Water Resources, supra; Friends of Mammoth v. Board of Supervisors,* 8 Cal. 3d 247, 104 Cal. Rptr. 761 (1972). Second, the governmental agencies may initiate and develop projects of their own, an occurrence most common to federal agencies. Under either agency function, its activities are the "action" covered by SEPA though in the first example the actual project is undertaken by a nongovernmental entity. However, regardless of the function involved, SEPA may apply.

The significant point to be recognized is that either function may involve more than one "major action", although there is only one project. There may exist several phases or stages of decision making for any one project and each stage, if "major", requires an environmental impact statement.

We hold that the provisions of SEPA apply because the agency action is "major", and the project had not reached a stage of completion by the date of SEPA's effectiveness which would foreclose the consideration of environmental factors mandated by the legislature.

■ In determining what "major action" means, we must ascertain and give effect to that meaning which the

legislature had intended for the term. The legislature's intent and purpose are to be determined from the subject matter and statutory text as a whole, interpreted in terms of the general object and purpose of the legislation. *Amburn v. Daly*, 81 Wn.2d 241, 501 P.2d 178 (1972) and *In re Estates of Donnelly*, 81 Wn.2d 430, 502 P.2d 1163 (1972).

To fulfill these purposes of restoring ecological health to our lives, SEPA *mandates* governmental bodies to consider the total environmental and ecological factors to the fullest in deciding major matters. The procedural duties imposed by SEPA—full consideration to environmental protection —are to be exercised to the fullest extent possible to insure that the "attempt by the people to shape their future environment by deliberation, not default" will be realized. *Stempel v. Department of Water Resources, supra* at 118.

The "continuing" policy and responsibility of the state is not only to *maintain* and *enhance* our environment, but to also "*prevent* or *eliminate* damage to the environment" and "*restore*" it. RCW 43.21C.010-.030. (Italics ours.) The maintenance, enhancement and restoration of our environment is the pronounced policy of this state, deserving faithful judicial interpretation. In view of this clear legislative mandate that SEPA be given a broad and vigorous construction, it is applicable to the third permit renewal of this case.

■ The October 1971 renewal of the building permit was a "major action" because it involved a discretionary nonduplicative stage of the building department's approval proceedings relative to an ongoing major project. As we noted previously, governmental action may be separated from the actual project, yet the action may be deemed "major". When such separation exists, as here, the character of the project must be considered in determining whether the government action is to be deemed "major".

There is no question but that if a building complex of this character had been initiated and constructed by the city it would constitute a major governmental action. The fact that the private sector undertakes the project, but only

with the approval of the government, does not diminish the "major" impact of the governmental participation.

In *Stempel,* we held the issuance of a water appropriation permit to be a "major action" though the actual project was not undertaken by the government, and here find that a renewal of a building permit is similarly the type of government action coming within SEPA provisions. To enforce the vigorous mandate of the legislature we include within the operation of the act those governmental actions that grant permits or other entitlements. This does not necessarily mean that every such "major action", whether it is the initial permit grant or a subsequent renewal, requires an environmental impact statement, for only those "major actions" which are "significantly affecting the quality of the environment" come within the act's provisions. RCW 43.21C.030(c).

Given that the ongoing project was significant in itself we are left to decide whether the renewal of the building permit is a discretionary and nonduplicative act so as to warrant SEPA's application. The October 1971 renewal was a discretionary act not mandatory under the Seattle building code. The relevant ordinance requires in permit renewals after the first that the superintendent of buildings, in approving the renewal application, must determine that the work permitted under the initial permit has begun and is progressing at an approved rate. In addition, the superintendent of buildings may, in his discretion, issue nonrenewable permits. Only the first renewal is mandatory under the ordinance and thus nondiscretionary.

The brief and argument of both the city and the developer indicate the approval sought pursuant to the permit renewal ordinance may involve "detailed study" and not mere routine. In rebutting the plaintiffs' assertion that the second renewal of the building permit was arbitrary and capricious, the city and the developer convincingly demonstrated that the review involved considerable discretion, deliberation and time.

However, what is consequential is the discretionary quality of the decision, and not the quantity of labor going to the decision's making. The fact is that this renewal stage of project approval could have resulted in termination of the project.

It is no answer to this finding of discretion in the renewal process that the department is bound and limited in its considerations to the permit renewal provisions of the Seattle code. Such a claim was raised and rejected in *Stempel* as being "no longer meritorious in light of the enactment of . . . SEPA." SEPA requires an integration of environmental factors into the normal governmental decision-making processes, so that the "presently unquantified environmental amenities and values will be given appropriate consideration in decision making along with economic and technical considerations." RCW 43.21C.030 (2) (b). Furthermore, the act expressly provides that it is "supplementary" to existing authorizations (RCW 43.21C.060) and that all branches of government are to review their present statutory authority to determine, in part, whether they are consistent with the act so that inconsistencies may be brought into conformity. RCW 43.21C.040.

In addition, in this case, it is no answer to the application of SEPA, to claim the renewal of a building permit is a modest exercise in a long process. Governmental action in approving a long-term project may occur at various intervals during the life of the project with various degrees of significance. It is unquestionable that numerous, modest and common governmental actions may be as damaging to the environment as a single, vigorous and critical action.

The granting of the renewal was nonduplicative because environmental issues were not considered in the granting of the original building permit or at any subsequent "major action". Furthermore, the intervention of new information or developments since an earlier "major action" that did consider environmental factors, would make the action nonduplicative. *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109 (D.C.

Cir. 1971). In this case, no environmental evaluation has taken place at any of the critical stages of governmental action. In addition, new developments (such as changes in the city's zoning ordinances) have presented themselves making this renewal nonduplicative and therefore an appropriate point for environmental evaluations in accordance with SEPA.

The renewal of the building permit is therefore a "major action" and because the project being approved has not reached a stage of completion foreclosing SEPA's effectiveness, an environmental impact statement would be required. Doubtless there may be ongoing projects at the effective date of SEPA which are at such a stage of development that the remaining governmental action, even though "major", could not possibly alter the program in accordance with RCW 43.21C.030(c). *Investment Syndicates, Inc. v. Richmond,* 318 F. Supp. 1038, 1039 (D. Ore. 1970).

█ The environmental impact statement provision of SEPA envisions detailed studies that consider a host of matters, including impact of the action, adverse environmental effects, alternatives, short and long-term consequences, and the extent to which resources are irreversibly or irretrievably committed. RCW 43.21C.030(c)(i-v). In addition, this study requires consultation with other public agencies and the development of "appropriate alternatives" to the recommended action. RCW 43.21C.030(d) and (e). Thus, SEPA is not applicable to the project which has reached that "critical stage" of completion foreclosing the consideration of environmental protection desired by the act. *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, supra* at 1128; *Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1331 (4th Cir. 1972); *Lathan v. Volpe,* 455 F.2d 1111, 1121 (9th Cir. 1971).

This project, prior to the third permit renewal, had not reached that critical stage because the possibility of modification or abandonment remained viable under the substantive options available in SEPA. RCW 43.21C.020(1), (2).

There are three alternate dates possible for application of SEPA to this project: the effective date of SEPA, August 9, 1971; the month prior to renewal on October 19, 1971; or, the actual date of renewal on October 19, 1971. On none of these dates had the project progressed beyond the construction of piling, and it clearly had not reached a stage of completion sufficient to warrant frustration of the mandate of SEPA that "no action which might minimize environmental damage may be dismissed out of hand." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, supra* at 1128. Where the governmental body has a "major action" upcoming (October 1971) it must begin its environmental evaluation sufficiently ahead of the action for it to be of value.

If the building department is allowed to await the date of its "major action" (here, the October 1971 renewal) in commencing its consideration of possible alternatives, effective evaluation may be foreclosed. The second renewal was made on April 19, 1971 and would expire on or about October 19, 1971. The record is silent as to when the application for the third renewal was made, but under the ordinance it could have been made on or about September 19, 1971, but no later than on or about October 19, 1971. The actual application for the third renewal need be made under the Seattle building code only "within the thirty day period immediately preceding the date of expiration."

The comprehensive review envisioned by SEPA is to be "detailed" and does not invite a lackadaisical approach. Not only must the reviews utilize the natural and social sciences, but also the environmental design arts in planning. RCW 43.21C.030(1)(a). In addition, prior to any detailed environmental statements (required by RCW 43.21C.030(1)(c)) the responsible official must consult other relevant public agencies and the resulting commentary must be forwarded to specific entities, including the Governor and the public. RCW 43.21C.030(1)(d). This circulation is to permit external review before the "major

action" occurs to insure governmental compliance with the provisions of SEPA.

Given the thoroughness of the environmental evaluation required under SEPA and the anticipated third renewal shortly forthcoming, the building department should have begun their review at SEPA's effective date or at such a time after SEPA's effective date that they could *anticipate* an application for a permit renewal would be made. The actual application cannot serve as the triggering mechanism to the building department's duty to prepare an environmental impact statement for that would create the paradoxical situation of having the operation of SEPA placed within the discretion of the developer, a result inconsistent with the act. The act speaks to the governmental entities and it is their duty to begin environmental evaluations when required by the act, independent of requests by the public or because of the developer's behavior. Therefore, the effective date of SEPA or when the building department could have anticipated a permit renewal application are the dates by which we measure the extent of the project's completion. The former date is August 9, 1971 and the latter at least sometime between September 19-October 19, 1971.

A review of the evidence and arguments indicates that by September 1, 1971, about 20 days after the effective date of SEPA, the only work completed at the site was the demolition of the previous structures (a moorage) and the placement of the pilings for the building. By October 1, well after SEPA's effectiveness and shortly prior to the third renewal, the pilings were filled with concrete but the capping of the filled pilings had yet to commence.

The work at the site commenced March 16, 1971 but no piling work was subsequently done on the site until June 7, 1971 and the demolition of the last portions of the moorage did not occur until June 21, 1971. On July 7, 1971 the last piling placements began and this work was completed by September 1, 1971. These hollow steel pipe pilings were then filled with concrete during September and

October. Caps then had to be placed on the concrete filled pilings but the record is silent as to the precise date this work was commenced or completed. The earliest such work could have been undertaken would be in the month of October.

Those federal cases concerned with the practicability of requiring an impact statement where there exists an ongoing project commenced prior to the effective date of the environmental policy act, suggest a balancing of appropriate factors. *Conservation Soc'y of S. Vt., Inc. v. Volpe*, 343 F. Supp. 761, 766-67 (D. Vt. 1972); *Arlington Coalition on Transp. v. Volpe*, *supra* at 1333; *Lathan v. Volpe*, *supra* at 1121; *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, *supra* at 1128. The essential factors balanced are the substantiality and likelihood of environmental harm due to the absence of any environmental evaluation if the project is constructed, as against the economic cost of investment in the project should it be *suspended or abandoned*.

Recognizing that there is no contest over the facts that no environmental evaluation has at any stage been undertaken by the building department or that this project significantly affects the environment, may the presence of the pilings alone frustrate the application of SEPA? They must not. It is far more consistent with the "fullest extent possible" mandate of the act to delay operation at this stage, where real environmental protection may come about, than to permit the completion of this project.

 This result is compelled, as only it fulfills the act's mandate that governmental bodies exercise their substantive discretion in protecting the environment "to the fullest extent possible." It is the avoidance of crisis decision making and catastrophic environmental damage for which SEPA is designed and its application in the instant case furthers that legislative policy. SEPA mandates governmental evaluation of environmental factors when choices are still available. In this case plausible choices remained prior to the third renewal. Therefore the impossible alter-

natives resulting from action in which environmental considerations are defaulted, may be avoided.

The particular choice ultimately arrived at, be it abandonment, alteration, or permission to complete construction, is not dictated by SEPA.[6] It is the evaluation of pertinent environmental factors that is mandated. The Roanoke Reef project was in an early stage of construction when the environmental impact statement should have been prepared. Given this early stage, the application of SEPA would have resulted in minimizing the investment costs if the ultimate decision is abandonment or alteration.

The developer contends that at time of trial and appeal construction had continued despite the litigation, and the project has thereby achieved a present stage of completion removing it from SEPA. Advancement towards the project's completion done in disregard of litigation-raising issues, such as SEPA, which may be held to be correct, can be of no consequence in the effort to refute the act's applicability. To permit such a contention would invite circumvention of SEPA by those quick to advance their projects to completion.

 Finally, as we held in *Stempel* and should affirm here, the permit-granting process is subject not only to the particular legislation authorizing it but also to those legislative enactments which *require* particular additional duties to be fulfilled by the governmental body (such as SEPA). Thus, cases may arise in which those who do business with regulatory agencies may be affected by the mandate of legislation subsequent to their grant from the government. In such cases, an objection to what the agency is *required* to do or not to do by virtue of the subsequent enactment need not be sustained. *Federal Housing Administration v.*

---

[6] Though a substantive result is not dictated by SEPA where adverse environmental impact is indicated, the approval of such a project may reveal an abuse of discretion by the public agency where mitigation or avoidance of damage was possible. *See Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289 (8th Cir. 1972); *Friends of Mammoth v. Board of Supervisors,* 8 Cal. 3d 247, 104 Cal. Rptr. 761 (1972).

*Darlington, Inc.,* 358 U.S. 84, 3 L. Ed. 2d 132, 79 S. Ct. 141 (1958); *Morningside-Lenox Park Ass'n v. Volpe,* 334 F. Supp. 132, 146 (N.D. Ga. 1971). Though those parties holding permits from the government may be disadvantaged by a subsequent mandatory act, such as SEPA, they may in some instances be favored. *National Helium Corp. v. Morton,* 326 F. Supp. 151 (D. Kan. 1971).

The policy of the people of the state, as announced in the State Environmental Policy Act of 1971, required an environmental impact statement before reissuance of the third renewal of the building permit.

## IV
### COMPLIANCE WITH THE SHORELINE MANAGEMENT ACT OF 1971

Assuming the original permit and construction valid, the trial court did not err in holding that construction of Roanoke Reef condominium is exempt from the permit requirements of the Shoreline Management Act of 1971 (RCW 90.58).[7] RCW 90.58.140 provides in part:

> (2) No substantial development shall be undertaken on shorelines of the state without first obtaining a permit from the government entity having administrative jurisdiction under this chapter.

The plaintiffs argue that actual bona fide construction of Roanoke Reef condominium did not commence until after June 1, 1971, the effective date of the Shoreline Management Act of 1971, and thus the defendant should be required to obtain a permit under RCW 90.58.140. All parties agree that Roanoke Reef condominium is a substantial development within the meaning of RCW 90.58.

The trial court found actual construction commenced upon the condominium project on March 15 and 16, 1971, by the demolition of a portion of the preexisting moorage improvements on the Roanoke property and the driving of 10 steel pipe piles. There is substantial evidence these test

---

[7] As no valid permit was in force to justify the preshoreline construction (*see* part I, *supra*) the act would now apply if substantial development is renewed. *See* WAC 173-14-050.

pilings were also permanent and this supports the trial court's findings.

## V
### BUILDING BEING CONSTRUCTED IS NOT AN OBSTRUCTION TO NAVIGATION

Lastly, the trial court concluded the condominium's construction does not impair the public right of navigation and recreation. It found the standards provided in *Wilbour v. Gallagher*, 77 Wn.2d 306, 316-17, 462 P.2d 232, 40 A.L.R.3d 760 (1969) for regulation by government of intrusions by property owners into navigable bodies of water were met. We agree with the trial court's conclusion, as the record establishes the existence of harbor lines and planned zoning, and in the absence of any showing of governmental abuses or irregularities in the adoption of such measures we decline to presume neglect by the public authority in considering the public interest. *Anderson v. Island County*, 81 Wn.2d 312, 317, 501 P.2d 594 (1972).

In *Wilbour v. Gallagher, supra* at 315-16, we required the abatement of certain fills in Lake Chelan insofar as they interfered with the public rights of navigation, primary and corollary, and thereby recognized that in the absence of governmental authorization to private property owners permitting such fills, "the public has the right to go where the navigable waters go, even though the navigable waters lie over privately owned lands." Thus, in the absence of such permission "[w]hen the land is submerged, the owner has only a qualified fee subject to the right of the public to use the water over the lands consistent with navigational rights . . ."

This rule was based not on the plaintiffs' offered theory of prescriptive rights nor on the particular deed of the case which explicitly provided the public with the right of access over the subject property. Rather, we based the decision's rule "on the proposition that the fills made by the defendants constitute an obstruction to navigation." *Wilbour v. Gallagher, supra* at 313. Such a rule was of neces-

sity on a lake of great beauty and recreational value for which modest governmental planning was provided.

In circumstances where appropriate planning by the relevant governmental bodies is undertaken through the establishment of harbor lines and by careful zoning, much of the problem faced in *Wilbour* would be cured. Such governmental effort is a more common occurrence in our urban situated waterways. *Harris v. Hylebos Indus., Inc.*, 81 Wn.2d 770, 505 P.2d 457 (1973).

The necessity of thoughtful management of our shorelines was recognized by our *Wilbour* decision and the legislature has recently enacted significant instruments for such management, the Shoreline Management Act of 1971 and the State Environmental Policy Act of 1971. Such enactments should provide the means for intelligently reconciling disparate interests in shoreline uses.

The judgment of the trial court is reversed.

HALE, C.J., FINLEY, ROSELLINI, HAMILTON, and STAFFORD, JJ., concur.

HUNTER, J. (dissenting)—I dissent. In my opinion the rights of the defendants vested at the time of the filing of their application on May 8, 1969, under the then existing ordinances. The law with regard to vesting of rights is stated in *Hull v. Hunt*, 53 Wn.2d 125, 130, 331 P.2d 856 (1958), as being that:

> [T]he right vests when the party . . . applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.

We adopted this rule, as the majority indicates, in order to avoid searching

> through (to quote from *State ex rel. Ogden v. Bellevue, supra* [45 Wn.2d 492, 275 P.2d 899 (1954)]) "the moves and countermoves of . . . parties . . . by way of passing ordinances and bringing actions for injunctions"—to which may be added the stalling or acceleration of administrative action in the issuance of permits—

to find that date upon which the substantial change of position is made which finally vests the right.

*Hull v. Hunt, supra* at 130.

Keeping in mind that we will not search through the moves and countermoves of the parties or administrative or judicial action in the issuance of permits, let us review the facts of this case.

It appears that on May 8, 1969, the defendants completed their application for a building permit. It also appears that a valid permit was finally issued on October 22, 1970. That is, the permit was in conformity with the laws in effect on the date of application. Under *Hull v. Hunt, supra*, the defendants' rights vested as of that date, May 8, 1969.

If we were to review the moves and countermoves of the various parties involved, we would find that on May 8, 1969, Roanoke Reef Associates (hereinafter referred to as the defendants), completed their application for a building permit. On the same day the superintendent of buildings issued the defendants a conditional permit. There is no provision for such a permit under the Seattle building code. It is a nullity.

We would also find that the defendants in this case were faced with the city's wrongful refusal to issue the defendants a street access permit. This wrongful behavior on the part of the city caused the delay in the issuance of the building permit until October 22, 1970. While this action was being litigated, there were several ordinance changes as pointed out by the majority. The conditional permit which was issued was renewed. This was a nullity as there was no building permit to renew. However, the fact that the city issued a conditional permit and renewed it on several occasions, does not invalidate the application. There was still an application on file and, on October 22, 1970, a permit was issued on said application. The first renewal would then be 1 year thereafter, which would be automatic in conformity with the ordinance. Seattle code 3.03.020 (h).

It might be argued that there was too great a time lapse

between the filing of the application and the issuing of the permit. The application was submitted in May of 1969, and the permit was not issued until October of 1970. However, the only conceivable time limitation on applications pending the issuing of a permit is provided in Seattle code 3.03.020 (f). It states in part:

> Drawings submitted for checking, for which no permit is issued, *and on which no action is taken by the applicant for six months,* shall be destroyed one month *after written notice is sent to the last known address of the applicant;* to renew action on said drawings, new drawings and a payment of a new drawing check fee shall be required.

(Italics mine.)

The record is not clear whether or not there was a 6-months lapse during which time no action was taken upon the application. However, we do note that during this time period the defendants took the affirmative action of applying for renewals of their conditional permit. In addition, they filed the mandamus action against the city to compel the issuance of a street access permit. There is also evidence in the record that numerous contacts took place between the city and the defendants during the interim. The sum total indicates that there was no 6-month period during which no action was taken by the defendants in relation to their application. This view is reinforced by the fact that none of the parties contends there was a 6-month lapse after May 8, 1969, during which time the application would have expired. In any event, no written notice was sent to the applicant of the city's intention to act under the ordinance, *supra.*

As heretofore stated, the permit as finally issued does not appear to be in conflict with any of the provisions of the code as of the date of application. What does appear to be in conflict with the provisions of the code is the administrative procedure adopted by the city which was totally outside the control of the defendants. According to the testimony of the superintendent of buildings, the procedure of

issuing conditional permits had been used in the past when the press of city business prevented the building department from making an immediate structural and ordinance check. Because of the press of city business, he issued the defendants a conditional permit which was conditioned upon a structural and ordinance check. This was totally outside the control of the defendants. The city's wrongful refusal to issue a street access permit was also totally outside the control of the defendants. The conditional permit which was issued in this case conferred no rights upon the defendants. They could not commence construction. It was, in effect, nothing more than a notation that the application was being processed.

Where, as here, the city has adopted an administrative procedure which is not in exact conformity with the ordinances under which it operates, and the defendant has in good faith relied upon the city's action, the state should be estopped from denying the validity of the defendant's building permit. *Finch v. Matthews*, 74 Wn.2d 161, 443 P.2d 833 (1968), and the cases cited therein.

In that case, we stated on page 171:

Equitable estoppel may be applied against the claim of the municipality where the acts are within the general powers granted to the municipality even though such powers have been exercised in an irregular and unauthorized manner, assuming that all of the other elements of the doctrine are present, as they are in this case. The rule is well stated in 31 C.J.S. *Estoppel* § 144 (1964):

Although, as discussed supra § 143, a municipality or other governmental agency cannot be estopped by its ultra vires acts, there is nevertheless a broad distinction to be observed between an irregular exercise of a granted power and the total absence or want of power; *and the rule is that a municipality or other governmental agency may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized.* (Footnotes omitted.)

. . .

This court, has long recognized that in determining

what acts of a governing body are ultra vires and void, and thus immune from the application of the doctrine of equitable estoppel, it must distinguish those acts which are done wholly without legal authorization or in direct violation of existing statutes, from those acts which are within the scope of the broad governmental powers conferred, granted or delegated, but which powers have been exercised in an irregular manner or through unauthorized procedural means.

(Italics mine. Footnote omitted.)

We then went on to explain that governmental immunity from estoppel is a derivative of the doctrine of sovereign immunity from suit without consent.

The legislature of this state has indicated that sovereign immunity in tort actions is no longer desirable or acceptable. RCW 4.92.090. The modern trend in both legislative and judicial thinking is toward the concept that the citizen has a right to expect the same standard of honesty, justice and fair dealing in his contact with the state or other political entity, which he is legally accorded in his dealing with other individuals.

*Finch v. Matthews, supra* at 176.

Under the facts of this case, it would appear that estoppel is available to the defendants, if necessary, to complete this project in accordance with the permit as granted. *See Steele v. Queen City Broadcasting Co.*, 54 Wn.2d 402, 341 P.2d 499 (1959).

In *Steele v. Queen City Broadcasting Co., supra*, cited and relied upon by the majority, we addressed a somewhat similar factual situation involving numerous delays upon the builder's part. In that case, the good faith which is apparent in this case was somewhat lacking. The plans that the defendant submitted with his application called for the construction of a tower on an area smaller than the minimum area authorized by law. There was also evidence to the effect that extensions of the conditional permit were unlawful. The permit that was issued was in violation of a specific prohibition of the code. After determining that the permit conferred no vested rights upon the defendants, we

stated on page 411: "Whether or not an injunction will issue must be determined by balancing the equities of the parties."

After balancing the equities between the parties we refused to grant an injunction prohibiting the defendants from finishing their project. *See also Bach v. Sarich*, 74 Wn.2d 575, 445 P.2d 648 (1968).

By comparison the present case cries for the administration of equity. The defendants should not be penalized for actions which were totally outside their control.

The majority infers, however, that the issuance of the permit on October 22, 1970, was invalid because it included the striking of the conditions on the old permit rather than the issuance of a new permit. Whether the building department issued a new permit or just crossed out the conditions on the old permit is a distinction without a difference. The defendants' plans were stamped approved on October 22, 1970, and at that time the defendants were qualified for the issuance of a building permit under the ordinances in effect on the date of their application. The defendants cannot be denied their permit because of a somewhat questionable administrative mechanical procedure in the issuance of the permit over which they had no control.

Whether we balance the equities, consider the state estopped, or apply the rule of *Hull v. Hunt, supra*, the result is the same; the defendants should be allowed to finish the project which they have started.

The majority holds that an environmental impact statement was not filed in conformity with the State Environmental Policy Act of 1971 (RCW 43.21C), and that the construction therefore cannot proceed until an environmental impact statement is filed by the city. They deem the issuance of the third renewal a "major action" within the contemplation of RCW 43.21C, since the issuance of it involved a discretionary nonduplicative stage of the building department's approval proceedings relating to this ongoing project. Assuming arguendo that the renewal is an approval stage, the majority is still inconsistent here, as the

third renewal is related to the conditional building permit issued on May 8, 1969, which it holds to be invalid. The only renewal that can be considered in this case would be that of the valid permit issued in October of 1970.

Under Seattle code 3.03.020 (h), as heretofore stated, the builder is entitled to an automatic renewal of his permit 1 year after it is granted. The superintendent of buildings is vested with no discretion in the issuance of the first renewal; it must be issued upon application. As the majority recognizes, no "major action" exists where there is a total absence of discretion upon the part of the governmental agency.

In summary on this issue, it would appear that the defendants were entitled to an automatic renewal of their building permit in October of 1971. Since this renewal did not involve an element of discretion upon the part of the city officers, I would hold that no environmental impact statement was necessary.

One who proceeds with construction in disregard of litigation does so at the risk of being required to remove such construction. *Wilbour v. Gallagher,* 77 Wn.2d 306, 462 P.2d 232, 40 A.L.R.3d 760 (1969), and *Bach v. Sarich, supra.* The defendants have been placed in the position of either proceeding with construction at the risk of being required to remove such construction or delaying construction until this litigation is completed. If the defendants do not proceed with the construction, they lose their rights to renewals. Under the Seattle code, in order to justify a renewal after the first renewal, one must be progressing sufficiently to justify the renewal. Where no progress exists, it would appear that the superintendent of buildings would be acting outside of his authority to grant a renewal. It would be unconscionable that the defendants in this case could be placed in the position of losing their right to proceed with construction by reason of the delay resulting from the institution of this action. The running of the time for renewals, therefore, under the ordinances, should necessarily be

tolled during the period the project has been delayed by reason of this litigation. To hold otherwise would be to allow any individual who wished to stop the construction of a building to stop it by instituting an action.

Conceivably, before the next renewal of the building permit after the conclusion of this litigation, if the applicant is able to proceed with the construction of this project, the construction may be completed or have progressed to the extent that there can be no question that to then apply the mandate of the environmental policy act, which was not in force at the beginning of the construction of this project, would constitute a retroactive application which we cannot determine at this time. Moreover, we cannot say that a satisfactory environmental impact statement would not be filed if required at the next renewal date.

The majority is also inconsistent in its discussion as to whether or not the actions of the building superintendent were arbitrary and capricious in rendering the second renewal of what it had already determined to be an invalid conditional permit.

There is no provision in the Seattle code as to the granting of renewals of conditional permits and therefore it is immaterial whether or not the actions of the superintendent of buildings were arbitrary and capricious. As heretofore stated, the only renewals we are concerned with are those running from the effective date of the building permit, October 22, 1970. Any issue as to the validity of any renewals of the conditional permit are a nullity and need not be discussed. As to the other issues raised in this case, I agree with the conclusions of the majority; however, my analysis would be as follows.

The plaintiffs contend that the trial court erred in holding that construction of the Roanoke Reef condominium is exempt from the permit requirements of the Shoreline Management Act of 1971 (RCW 90.58). I disagree, as has the majority.

An analysis of this contention requires consideration of RCW 90.58.140, which provides in part:

(2) No substantial development shall be undertaken on shorelines of the state without first obtaining a permit from the government entity having administrative jurisdiction under this chapter.

The plaintiffs argue that actual bona fide construction of Roanoke Reef condominium did not commence until after June 1, 1971, the effective date of the Shoreline Management Act of 1971, and thus the defendant should be required to obtain a permit under RCW 90.58.140. All parties agree that Roanoke Reef condominium is a substantial development within the meaning of RCW 90.58.

The trial court found that actual construction commenced upon the condominium project on March 15 and 16, 1971, by the demolition of a portion of the preexisting moorage improvements on the Roanoke property and the driving of 10 steel pipe piles. The plaintiffs do not challenge the fact that the above occurred, but they do challenge the finding that the driving of the 10 steel pipe pilings was the actual commencement of construction. They argue that the driving of the 10 steel pipe pilings, most of which had their original position changed slightly, was merely a dry run, another form of testing, prior to the commencement of construction.

Mr. Johnson, the project manager, testified that the 10 steel pipe pilings were to be permanent pilings according to the Harvey Dodd structural pipe design plan. Mr. Peter Haug, vice-president of Manson Construction and Engineering Company, the company that was hired to drive the piling, testified as follows:

A. They [the pilings] were definitely to be put in a permanent place. I wouldn't advocate to anybody that for any—almost any kind of piles that they would put in something that wouldn't stay in a permanent position, because they cost too much to drive, to drive in a temporary location and be moved.

There is also testimony to the effect that Pacific Testing Laboratories had an inspector on the site when the piles were driven. The record indicates that there is no require-

ment for Pacific Testing Laboratories to be on the site if the piling is for testing purposes. Apparently, they are required to be present if the piling is to be a permanent part of the structure.

The position of the trial court is further supported by the fact that Gilbert Pile Driving Company was engaged to drive a series of wooden piling in and around the subject property in 1967 and 1968 for the purposes of testing the area.

Where the trial court's findings are supported by substantial evidence, they will not be overturned. *Sheldon v. Hallis,* 72 Wn.2d 993, 435 P.2d 988 (1967); *Stringfellow v. Stringfellow,* 56 Wn.2d 957, 350 P.2d 1003, 353 P.2d 671 (1960), and cases cited therein; *Croton Chem. Corp. v. Birkenwald,* 50 Wn.2d 684, 314 P.2d 622 (1957).

Since the defendant commenced construction on Roanoke Reef condominium prior to the effective date of the Shoreline Management Act of 1971, the provisions of the act do not apply to said construction. WAC 173-14-050.

The plaintiffs also contend that the Roanoke Reef condominium will be an obstruction to navigation and water recreation and thus the holding of the trial court is in conflict with this court's holding in *Wilbour v. Gallagher,* 77 Wn.2d 306, 462 P.2d 232, 40 A.L.R.3d 760 (1969). I disagree, as does the majority.

In the *Wilbour* case this court ordered that the fills made by the defendants in Lake Chelan be abated insofar as they interfered with the rights of navigation in said lake. The defendants in that case derived their title through deeds which stated on page 314 n.11, that the property was subject

> "to the perpetual right to raise the waters of Lake Chelan, Washington to the elevation of eleven Hundred (1100) feet above mean sea level, and to perpetually inundate and overflow [said property] to said elevation of eleven hundred (1100) feet above mean sea level."

The majority's opinion in the *Wilbour* case, as stated on page 313, was based upon the premise that:

> There was no private ownership of the land under Lake Chelan in its natural state, and no right to obstruct navigation.

This is the main factor which distinguishes the *Wilbour* fact situation from the one in the instant case. In the instant case, we are dealing with land under Lake Union that was sold into private ownership by the state *without limitations*, comparable to the same classification as tidelands deeded by the state to private ownership in *Harris v. Hylebos Indus., Inc.*, 81 Wn.2d 770, 505 P.2d 457 (1973).

The *Harris* case is dispositive of this issue. We therein stated on pages 785-86:

> [N]one of the cases cited herein pertaining to the legal status of tidelands deeded to private individuals by the state were considered pertinent to the question before the court in that case [*Wilbour v. Gallagher*, 77 Wn.2d 306, 462 P.2d 232, 40 A.L.R.3d 760 (1969)]. The obvious reason is that such tidelands, as we have heretofore pointed out, have never been classified by the state as navigable waters, but rather have been treated as land. Particularly, where such lands lie in city harbors, as here, they have been regarded as most suitable for reclamation and for dedication to the purposes of commerce and industry.
> . . . The legislative intent regarding the use of tidelands in harbors of cities is manifestly that the navigable portions of such harbors, behind the harbor lines, shall consist of commercial waterways, and that the filling and reclaiming of the tidelands which have been sold to private parties shall be encouraged.

(*Footnote omitted.*)

I would affirm the decision of the trial court.

WRIGHT, J., concurs with HUNTER, J.

Petition for rehearing denied December 13, 1973.