[No. 2249-44358-3. Division Three. August 29, 1977.]

RICHLAND HOMEOWNER'S PRESERVATION ASSOCIATION, ET AL, *Appellants,* v. ROBERT YOUNG, ET AL, *Respondents.*

*Thomas J. Heye* and *Butler, Heye, Cowan & Wolcott,* for appellants.

*Hugh B. Horton, Horton, Wilkins, Faurholt & Kerr, Rembert Ryals,* and *Critchlow, Williams, Ryals & Schuster,* for respondents.

McINTURFF, J.—The plaintiffs appeal from a denial of an injunction and the dismissal of their action against the defendants. Plaintiffs sought to declare as invalid a building permit issued by the City of Richland to Mr. Young, a developer, for an 83–unit apartment complex. In addition, they requested an injunction against further construction by Mr. Young under the permit in question and an order requiring him to remove all construction on the premises in question. The action was based on two theories: (1) the City did not comply with the State Environmental Policy Act (SEPA) because it failed to file a detailed statement on the project's environmental impact and (2) the City failed to comply with its building code in issuing the questioned permit. The trial court dismissed the action with prejudice. We affirm.

On February 23, 1976, Mr. Young filed with the City an application for a building permit for an 83–unit apartment complex in North Richland, along with three sets of detailed plans for the project. At the same time he filed an environmental information worksheet. The plans were circulated among various city officials who "redmarked" them to indicate modifications required to bring them into compliance with various city code provisions.

Meanwhile, Robert Leedy, planning supervisor for the City, undertook an environmental evaluation of the project, and he determined that if there were assurances by the applicant that dust would be adequately controlled during the construction phase, there was no need for an environmental impact statement. He did not consider the project as having a significant effect on the quality of the environment in the City of Richland.

On March 1, 1976, the building permit was issued on the plans as redmarked, conditioned upon compliance with the changes made by the city staff. On March 22, 1976, a plan-

check letter indicating the modifications in the plans was forwarded to Mr. Young. Sometime after the issuance of the permit, a zone change was made to permit only single-family units on the land in question.

The plaintiffs contend that the City's decision to not require a detailed environmental impact statement (EIS) is arbitrary or capricious and/or clearly erroneous because the City did not give appropriate consideration to the question of whether construction of the apartment complex would have a significant impact on the environment. They argue that the City's method of determining the potential impact was inadequate in that the responsible official did not prepare a written "threshold determination" stating his reasons for not requiring an impact statement and that he did not consider the impact of the project on city water, sewer, traffic, school or electrical facilities.

We note first that not all governmental actions require detailed environmental impact statements. *Eastlake Community Council v. Roanoke Associates, Inc.*, 82 Wn.2d 475, 491, 513 P.2d 36, 76 A.L.R.3d 360 (1973). Such statements are required only for "major actions significantly affecting the quality of the environment". RCW 43.21C.030(2)(c). There is no argument that the issuance by the City of the building permit to Mr. Young is a "major action."[1] Instead, the disagreement centers around the question of whether construction of the apartment complex would significantly affect the quality of the environment.

In reviewing the actions of a governmental official who determines that an environmental impact statement is not required, two standards are available. The negative threshold determination (no EIS is required) may be overturned because it is clearly erroneous or arbitrary or capricious. *Norway Hill Preservation & Protection Ass'n v. King*

---

[1]See *Eastlake Community Council v. Roanoke Associates, Inc.*, 82 Wn.2d 475, 490, 513 P.2d 36 (1973), where the court found that a renewal of a building permit was a major action because it involved a "discretionary nonduplicative stage of the building department's approval proceedings relative to an ongoing major project."

*County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976). The test under the "arbitrary or capricious" standard is whether there is evidence in the record to support the administrative decision. The "clearly erroneous" standard is broader because it calls for a review of the entire record and all the evidence instead of merely a search for substantial evidence to support the administrative finding. And, it requires consideration of the public policy contained in the act of the legislature which authorized the decision. Thus,

A determination of no significant environmental impact "can be held to be 'clearly erroneous' if, despite supporting evidence, the reviewing court on the record can firmly conclude 'a mistake has been committed.'" *Stempel v. Department of Water Resources,* [82 Wn.2d 109, 508 P.2d 166 (1973)] *supra* at 114, quoting *Ancheta v. Daly,* [77 Wn.2d 255, 461 P.2d 531 (1969)] *supra* at 260.

*Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 275.

■ The question to which we apply those standards is whether Mr. Leedy erred in concluding that the apartment construction would not significantly affect the environment. We note that such negative threshold determinations have created considerable litigation.[2] Our Supreme Court has twice addressed the question of what type of actions "significantly affect" the environment. In *Narrowsview Preservation Ass'n v. Tacoma,* 83 Wn.2d 416, 423, 526 P.2d 897 (1974), the court noted:

the term "significantly" has been defined to include the examination of *at least* two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.

(Italics ours.) More recently the court has conceded that a precise and workable definition of the phrase is elusive

[2]*See, e.g.,* the cases cited at n.16 in *Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975).

because of subjective judgments in the area. It said in *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 278:

> Consistent with this policy it would seem appropriate to state a general guideline rather than attempt a value-laden definition of "significantly." Generally, the procedural requirements of SEPA, which are merely designed to provide full environmental information, should be invoked whenever more than a moderate effect on the quality of the environment is a reasonable probability. *See City of Davis v. Coleman,* 521 F.2d 661, 673–64 & n.16 (9th Cir. 1975).

Clearly, as will be shown, there is evidence in the record to support Mr. Leedy's decision not to require a detailed EIS. Thus, his action cannot be considered arbitrary or capricious. However, under the "clearly erroneous" standard we must review the entire record and all the evidence, keeping in mind the public policy contained in SEPA.[3] We note that

> [i]n any action involving an attack on a determination by a governmental agency relative to the . . . absence of the requirement, . . . of a "detailed statement", the decision of the governmental agency shall be accorded substantial weight.

RCW 43.21C.090.

---

[3]See RCW 43.21C.020, which provides:

. "Legislative recognitions—Declaration—Responsibility. (1) The legislature, recognizing that man depends on his biological and physical surroundings for food, shelter, and other needs, and for cultural enrichment as well; and recognizing further the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource utilization and exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, *declares that it is the continuing policy of the state of Washington, in cooperation with federal and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to: (a) Foster and promote the general welfare; (b) to create and maintain conditions under which man and nature can exist in productive harmony; and (c) fulfill the social, economic, and*

The record shows that the parcel of land in question consists of 3.6 acres in North Richland. The land immediately north lies in Benton County and is zoned as "unclassified," permitting any uses. To the west are the City's well fields and the land is zoned as "public reserve." Directly northeast of the project, the land is vacant, and 220 feet southwest of the project, the land is zoned for apartments. Just beyond that, the land is zoned business and commercial. The apartment complex is bordered on the west by George Washington Way, a 4–lane highway with a 35 m.p.h. speed limit. About 400 feet south is Clipper Ridge—a high density development with a combination of housing facilities. Between that development and the parcel in question is undeveloped sagebrush.

The project would have the following impact on various city and utility systems:

(1) Water. The City of Richland is growing rapidly, and there is a need for additional water facilities to meet the growth. Water shortages are anticipated annually during the summer months. The present system carries from 28 million to more than 36 million gallons per day; and the apartment project would add 40 thousand gallons to that sum. Eighty–three single–family dwelling units would require significantly more water usage than the apartment complex.

(2) Traffic. George Washington Way is a major arterial bordering on the proposed project. At the time the project was proposed it carried more than 5,200 vehicles per day, but the greatest traffic problems on that arterial lay to the south of the project. Single–family dwellings on the parcel would add fewer than 26 vehicles per day.

(3) Sewer. The City's sewage system carries slightly less than 5 million gallons per day, and the apartment project

*other requirements of present and future generations of Washington citizens."* (Italics ours.)

    See also *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 272–73, 552 P.2d 674 (1976); *Eastlake Community Council v. Roanoke Associates, Inc.,* 82 Wn.2d 475, 489–90, 513 P.2d 36 (1973).

adds less than 41 thousand gallons to that total. As in the case of the water system in North Richland, the sewer facilities are newer than in other parts of the city.

(4) Schools. More than 8,000 students attend schools within the City, and the apartment complex would add 40 to 50 more. They would attend nearby Hanford School which, like the rest of the Richland educational system, is becoming increasingly crowded.

(5) Dust control. Mr. Leedy determined that blowing dust during the construction phase of the apartment project could affect the neighborhood environment so he conditioned the issuance of the building permit upon measures to be taken by the developer to avoid the problem. Dust control is easier to achieve on large projects such as the apartment complex, and there would be greater problems if the land had been developed into single–family dwellings. A nearby homeowner who is president of the plaintiff nonprofit corporation has complained of blowing dust especially during high winds, but no complaints have been registered with the City.

Insofar as the environmental effects are concerned the project would not have a different impact if it was built west of George Washington Way. One of the plaintiffs, however, told the Richland City Council that if the project was built there it would not be as objectionable. Furthermore, since Mr. Young obtained the building permit and began construction, the zoning of the property has been changed to single–family dwellings.

The evidence shows that in deciding the project would not have a significant effect on the environment, Mr. Leedy consulted a few sources but relied extensively on his personal knowledge of the various city systems. On the question of the project's effect on the water system, he called an unidentified person in the City's water department to determine if there was water available for residential construction in North Richland. He testified that he was aware of the impact population growth put upon the system, and he acknowledged that he was not a water systems expert.

He said he was unable to answer questions regarding the effect of the apartment complex on the system during hot–weather periods; but he had, the previous year, been involved in studies concerning the availability of water and sewer facilities in the area in question. The studies, he said, were made at the request of the Richland City Council to determine availability of water and sewer facilities and the capability of the existing system to meet demand. As a result of the studies it was determined there was sufficient capacity to meet the areas zoned at the time for residential development within the city proper. He testified:

I have to stress the fact that I was deeply involved in developing the availability of water and sewer to serve the North Richland area as well as Richland proper, and that was the reason I did not consult anybody regarding their particular project.

We had determined through the activities of the engineering division and my division, and people in the utilities department, that from a water and sewer standpoint we would be able to serve the remaining zoned area and areas designated by comprehensive plan for residential development within the city, and I used that as a basis.

On the question of the apartment complex's impact on traffic on the major arterial, Mr. Leedy indicated that he may have contacted the City's traffic engineer. He admitted, though, that he was not too familiar with traffic flow along George Washington Way and he did not personally visit the project site during peak periods of traffic flow. On the other hand, he did rely on a 1974 report prepared by consultants to the City and entitled "Traffic Operations Program to Increase Capacity and Safety." It was based primarily on historical data, and Mr. Leedy did not recall whether it made future traffic projections. On the question of traffic generally, he testified:

[A]gain as a general routine we are looking at, as I have indicated before, traffic counts generally, traffic volumes, and recommendations for improvement to the system, and as a general rule we know in our office, and based on data engineering provided, that from a traffic generation standpoint and impact on the community you are far

better off with development near the employment center, at the north end, from a traffic reduction standpoint, than we are with development at the south end, or south of the City.

On the question of additional students enrolled at the nearby Hanford School, Mr. Leedy did not contact anyone in the school district, and he was not aware of the precise impact the development would have on the school. However, he was familiar with the crowded school situation, and he generally conducted meetings between his department and the school administration which maintained ongoing communication. He testified:

We have representatives from the school administration on our Technical Advisory Committee for the purposes of reviewing and commenting on proposed plats, proposed subdivisions, planned unity [sic] developments, commercial site plans, and we have had representatives from the same administration on our Comprehensive Planning Technical Advisory Committee where we're dealing with proposed land uses and general densities.

Finally, on the dust control question Mr. Leedy said blowing dust could have a significant effect upon a developed neighborhood. He said that at the time he completed his environmental analysis he was not aware of any particular city ordinance concerning dust control but he was aware of regulations generally. In connection with dust problems the developer was required to sign a report stating he had read applicable dust control laws and would comply with them. Every builder in Richland is required to sign them as a matter of course.[4]

---

[4] The plaintiff here contends that the condition imposed by Mr. Leedy before he approved issuance of the building permit, *i.e.*, adequate dust control measures, is itself indicative of the need for a detailed EIS. Citing *Norway Hill,* the plaintiff argues that if the dust control problem was significant enough to require the imposition of conditions in order to meet with governmental agency approval, then it was "significant" enough to require an EIS. That does not necessarily follow. Although the court said in *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 279, "nor does the imposition of conditions nullify, for SEPA purposes, the otherwise significant effects of a project or government action", it is clear from that opinion that requiring protective conditions is not

■ After our review of the evidence as detailed above we cannot "firmly conclude 'a mistake has been committed.'" *Stempel v. Department of Water Resources,* 82 Wn.2d 109, 114, 508 P.2d 166 (1973). According substantial weight to the determination of Mr. Leedy, as we must, we do not find that "more than moderate effect on the quality of the environment is a reasonable probability." *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 278. The effect of the apartment complex on the various City systems as outlined above, while not negligible, is certainly less than moderate.[5] The reports concerning the adequacy of the water and sewer systems for residential development and Mr. Leedy's direct involvement in the effect of planning decisions on the school system are significant. Furthermore, when we consider the factors cited in *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974), our conclusion is strengthened. First, we do not find adverse environmental effects created by the project exceeding those created by existing uses. If anything, a multiple–family dwelling at the location creates fewer problems in some respects. Secondly, as we noted above the "absolute quantitative adverse environmental effect" does not exceed a moderate effect.

---

enough to require a detailed EIS. The court said such conditions "may be considered in evaluating the effect of a government action on the quality of the environment", *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at 279, and a detailed EIS is required only where the effect would be significant. Since all builders are required to comply with applicable dust control regulations in Richland, plaintiffs would require a detailed EIS for each project. That is not the intent or spirit of SEPA. *See Eastlake Community Council v. Roanoke Associates, Inc.,* 82 Wn.2d 475, 513 P.2d 36 (1973).

[5]Nor does the project here seem to be the kind of affront to the environment considered in cases such as *Norway Hill* and *Swift v. Island County,* 87 Wn.2d 348, 552 P.2d 175 (1976). In *Norway Hill,* 52.3 acres of a heavily wooded tract were to be divided into 198 lots, each with a single–family dwelling. As the court said there, the project involved "a large area and a large number of homes, including all the necessary amenities. In addition to its magnitude, the project will constitute a complete change of the use of the existing area. Moreover, certain reports indicated that the project will create runoff and soil erosion problems." *Norway Hill Preservation & Protection Ass'n v. King County Council, supra* at

Therefore, we affirm the trial court insofar as its decision regarding the lack of an EIS.[6]

The second question for our consideration is the trial court's conclusion that the building permit issued by the City was valid. The plaintiffs rely heavily on *Eastlake Community Council v. Roanoke Associates, supra,* where our Supreme Court held that a building permit which was issued contrary to the provisions of the Seattle Building Code did not vest any rights in the builder who constructed under it. Nor, the court held, was the unlawful permit subsequently cured by the compliance of the developer with its conditional provisions. Here plaintiffs contend that the City of Richland violated its own ordinances in issuing the permit to Mr. Young because (1) as submitted they did not conform to provisions of the code and relevant laws, ordinances, rules and regulations and (2) because they were approved as modified by the City staff through "redmarking" of questionable provisions and subject to a plan–check letter which was not forwarded until 3 weeks after the plans were approved. Specifically, plaintiffs complain that the red–lining and plan–check procedures are not authorized by the City building code.[7]

We agree that the procedures employed by the City of Richland are not set out in the code. But neither is any other procedure by which appropriate city officials may

---

278. In *Swift* the development would have interfered with wildlife, a famous historical site and competing area recreational uses.

[6]We note that the trial court applied the "arbitrary and capricious" standard. *Norway Hill Preservation & Protection Ass'n v. King County Council, supra,* which authorized the use of the "clearly erroneous" standard as well was not decided until a month after the trial here. We have applied both standards of review, however, in order to avoid subsequent questions, and we note that all parties have applied the "clearly erroneous" standard in their arguments.

[7]In 1974 the City of Richland adopted Richland Municipal Code § 21.08.010 which provides:

Pursuant to the provisions of RCW 35.21.180, and in conformance therewith, the Uniform Building Code, 1973 Edition, with appendixes, prepared by the International Conference of Building Officials, is adopted by reference as the building code of the city, except as hereinafter amended.

Thus, we refer to the applicable sections of the UBC.

advise the permit applicant of modifications necessary for compliance with applicable statutory, code or ordinance provisions. The question should be whether the procedures employed insure compliance with the building code. *See Eastlake Community Council v. Roanoke Associates, Inc., supra* at 482. We find that they did and, we also affirm that portion of the trial court's conclusion as to the validity of the building permit.

Here, after the plans were submitted, they were reviewed by the City's planning, fire and water and sewer staffs. As they were reviewed, the departments marked various portions of them in red to bring them into compliance with applicable law, a procedure which witnesses said was employed throughout the country. One set of plans was kept in the building department, and another, marked in "exactly the same way" was given to the builder who was required to keep them at the job site.

Section 302 of the Uniform Building Code provides in pertinent part:

> When the Building Official issues the permit, he shall endorse in writing or stamp on both sets of plans and specifications "APPROVED." Such approved plans and specifications shall not be changed, modified, or altered without authorization from the Building Official, and all work shall be done in accordance with the approved plans.

The plans, as redmarked, were approved by the building department on March 1, 1976. The fact that they were conditioned upon a plan–check letter which did not appear until March 22, 1976, is not material here. The plan–check letter did nothing more than clarify the changes made in the plans through the red–lining procedure. As the City notes in its brief, "If new or different matters were raised [by the letter], then Appellants might have an issue. In this case they do not."

Furthermore, *Eastlake Community Council* is distinguishable. There the permit in question was approved subject to an ordinance and structural check. Presumably the

418

plans did not then meet code and ordinance requirements when approved. Here the permit was based upon plans which had been put into compliance and approved by the City staff in accordance with the necessary modifications within them.

The judgment of the Superior Court is affirmed.

MUNSON, C.J., and GREEN, J., concur.