[No. 3060–2.   Division Two.   March 12, 1979.]

RICHARD SHORT, *Respondent*, v. CLALLAM
COUNTY, *Appellant*.

*Grant S. Meiner, Prosecuting Attorney,* and *Craig L. Miller, Deputy,* for appellant.

*Niichel & Rutz* and *David V. Johnson,* for respondent.

REED, J.—In October 1976, Richard Short applied to the Clallam County Board of Commissioners for a permit to construct a 24–stall, 20– by 100–foot mini–warehouse on land lying north of State Highway 101 and east of the Dungeness River Bridge. In his environmental checklist (WAC 197–10–050), Short stated he intended to construct only the one building "to begin with" but "if and when full occupancy is reached, more stalls will probably be added to the original structure."

Because of these disclosures the Board requested additional information regarding Short's plans. He responded by filing a plot plan on which he depicted not only the

building for which he was seeking a permit, but two additional structures.

On December 9, Short appeared before the Board where he was quizzed in detail regarding his plans. Short insisted he was seeking a permit for only one building; that he had no specific present intention of building the others. Nevertheless, the Board ruled that issuance of the permit would have a significant effect upon the environment and ordered an Environmental Impact Statement (EIS). The Board's decision was based on the following facts: (1) although Short's land was not zoned, the area was devoted primarily to residential and agricultural uses; (2) it was so designated on the County's comprehensive land–use plan; (3) some of Short's neighbors had voiced opposition to commercial development of the site; and (4) the proximity of Short's venture to the Dungeness Bridge approach would cause traffic safety problems. At this juncture Short simply abandoned his request for a building permit.

On December 27, 1976, Short's brother Joe obtained a permit from the County Department of Public Works to construct a "barn" on the site for "farm use only. No sales or business." Pursuant to this permit Short constructed a 24–stall, 20– by 100–foot building. Although the county building inspector issued final approval for the structure, he observed: "this is the strangest looking barn I have ever seen." On March 11, 1977, 1 day after his barn was approved, Short applied to the Board for a change of use permit, to convert the barn to a mini–warehouse. On his environmental checklist he stated he was "undecided" about future expansion.

On April 4, 1977, Short again appeared before the Board. Despite extensive interrogation about his plans, he continued to maintain he was not sure about the future. The Board confronted Short with his "barn," suggested he had never intended to use it as such and had planned all along to build a mini–warehouse. Short admitted the building had never been used as a barn and conceded his plans had not changed materially since the hearing of December 9.

Construing Short's answers as meaning he intended to construct two more warehouses, the Board again required preparation of an EIS.

It is not at all clear from the record of proceedings before the Board that Short was relying upon or that the Board gave any consideration to state and local State Environmental Policy Act (SEPA) guidelines under which Short's building was classified as exempt from EIS requirements. WAC 197–10–140(24) excludes from the definition of "major action" any of the actions exempted by WAC 197–10–170(1)(c), which reads as follows:

> Categorical exemptions. Governmental activities or approvals of activities of the types listed herein *are not major actions, and proposals for such activities are exempted* from the threshold determinations and EIS requirements of SEPA and these guidelines:
>
> (1) Minor new construction. The following types of construction *shall be exempt* except when undertaken wholly or in part on lands covered by water; the exemptions provided by this subsection apply to all licenses required to undertake the construction in question, except when a rezone or any license governing emissions to the air or water is required:
>
> . . .
>
> (c) The construction of an office, school, commercial, recreational, service or storage building with less than 4,000 square feet of total floor area, and with associated parking facilities designed for twenty automobiles or less.

(Italics ours.) In addition, Clallam County ordinance No. 56–1974, adopted pursuant to WAC 197–10–150, reads in part as follows:

> BE IT HEREBY ORDAINED by the Board of Clallam County Commissioners that the following classes of action *do not require a further determination of environmental significance, the preparation of an impact statement, or the preparation of the declaration of significant impact:*
>
> . . .
>
> 3. Class 3: . . . actions involving the construction and location of single small structures or facilities, not in conjunction with the building of two or more such units,

and other minor development, not occurring in a "sensitive area." Including but not limited to:

. . .

(c) *Small one story* offices, recreation, *service and storage buildings designed for an occupant load of 25 persons or less and with less than 2,500 square feet of the floor area;*

(Some italics ours.)

Short promptly sought review in the Clallam County Superior Court. The trial court reversed the Board, finding it had acted contrary to law, in disregard of its own ordinances and on insufficient evidence. The County appealed. We affirm.

The County's appeal presents the following issues: (1) What is the proper standard for judicial review of a county's affirmative threshold determination to require an EIS? (2) Are future, indefinite, conditional plans part of the "proposal" when permission is sought to change the use of an existing structure which is categorically exempt under state and local law and which will remain exempt if permission is granted? Stated another way, may such future plans be considered in assessing the environmental impact of issuing the change of use permit if that is all that is sought?

APPROPRIATE STANDARD OF REVIEW

■■ As to the first issue, we note that quasi–judicial determinations of purely local agencies, such as the Board of Commissioners, are not reviewable under the provisions of the administrative procedures act, RCW 34.04, *Riggins v. Housing Authority,* 87 Wn.2d 97, 549 P.2d 480 (1976). Rather, review is conducted under the court's inherent or statutory powers and an agency determination will be reversed only if found to be arbitrary and capricious or contrary to law. Surprisingly, Clallam County argues—and of course Short hastens to agree—that because the Board's decision to require an EIS arose from the environmental concerns of SEPA, RCW 43.21C, our review must be governed by the broad clearly erroneous test rather than by

the usual, more restrictive arbitrary and capricious or contrary to law standard, *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976). We do not agree. In *Norway Hill,* the court adopted the clearly erroneous standard of the administrative procedures act to review a "negative threshold" determination, whereas here the Board affirmatively called for an EIS. The policy enunciated in *Norway Hill* was to foster the environmental full disclosure goals of SEPA. Hence, the Supreme Court was more easily persuaded to overturn an agency decision which might possibly have conflicted with those goals. In this case the Board's decision to call for an EIS serves to implement the policies and concerns of SEPA rather than to impede or frustrate those aims. It seems to us, therefore, that an affirmative threshold determination should be overturned only if found to be arbitrary and capricious or contrary to law.

Nor do we think the recent decision in *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978), mandates otherwise. In *Polygon* the court held that the broad clearly erroneous standard employed in *Norway Hill* ought to apply as well to agency denial of a building permit on SEPA grounds. As stated in *Polygon* at page 69:

> It has long been recognized that substantive and procedural safeguards are necessary to protect property owners from abusive and arbitrary land use regulations. While we have indicated that specific protections developed in the zoning area are not applicable to a building permit denial, we recognize that the same potential for abuse exists. This is particularly true in view of the fact that environmental factors, especially those involving visual considerations, are not readily subject to standardization or quantification. That potential for abuse is even stronger where the decision must be made in a climate of intense political pressures.
>
> We believe that this potential for abuse, together with a need to ensure that an appropriate balance between economic, social and environmental values is struck,

requires a higher degree of judicial scrutiny than is normally appropriate for administrative action. Consequently, in order that there be a broad review, we apply the clearly erroneous standard to the superintendent's denial of Polygon's building permit.

(Footnote omitted.) The difference between denial of a permit on the basis of a fully developed study of the environmental consequences of a proposed action on the one hand, and merely requiring preparation of an EIS on the other, is obvious. As noted in *Polygon,* denial of a building permit directly limits the owner's use of his property for certain purposes. By contrast the preparation of an EIS, though perhaps onerous for the landowner, does not directly impose a limitation on his use of his land. Further, the decision to require an EIS is made at an early stage when neither the agency nor a reviewing court has the benefit of a full environmental inquiry. *Polygon Corp. v. Seattle, supra* at 67. In such cases substantial weight ought to be accorded to an affirmative threshold determination, RCW 43.21C.090, and it should be overturned only if arbitrary and capricious or contrary to law.

BOARD DECISION WAS CONTRARY TO LAW

■■■■ Based upon the facts we have outlined and the inferences it drew therefrom, the Board concluded that Short intended to construct additional warehouses if a change of use permit was granted. In doing so the Board was merely making a factual determination, but when it further determined that Short's future plans were part of his "proposal," and that the issuance of the permit would constitute a "major action" under SEPA, the Board was necessarily interpreting RCW 43.21C.030(2)(c), and applying that interpretation to the facts found by the Board. Thus we are presented with, at the least, a mixed question of law and fact or, at the most, a pure question of law. Under these circumstances the court will conduct its own independent review of the Board's decision, *cf. Carpenter v. Island County,* 89 Wn.2d 881, 577 P.2d 575 (1978); *Daily Herald Co. v. Department of Employment Security,* 91

Wn.2d 559, 588 P.2d 1157 (1979); *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 525 P.2d 774 (1974); *Helland v. King County Civil Serv. Comm'n*, 84 Wn.2d 858, 529 P.2d 1058 (1975).[1] In cases where the administrative agency is charged with administering a special field of law and endowed with quasi–judicial functions because of its expertise in that field, its construction of statutory words and phrases and legislative intent should be accorded substantial weight when undergoing judicial review. *Belgarde v. Brooks*, 19 Wn. App. 571, 576 P.2d 447 (1978). *See also Norway Hill Preservation & Protection Ass'n v. King County Council, supra.* Such is not the case here. The Clallam County Board of Commissioners is only one of many state and local agencies charged by the legislature with implementing the policies of SEPA. *See Juanita Bay Valley Community Ass'n v. Kirkland*, 9 Wn. App. 59, 510 P.2d 1140 (1973). As contrasted with agencies such as the Shorelines Hearings Board, *see Department of Ecology v. Ballard Elks*, 84 Wn.2d 551, 527 P.2d 1121 (1974), the Board of County Commissioners cannot be said to possess any particular expertise in the environmental sphere. Because the statutory phraseology, "proposals for legislation and other major actions significantly affecting the quality of the environment," RCW 43.21C.030(2)(c), is of general statewide application and the interpretation of this language is critical to numerous other agencies engaged in enforcement of the act, the court should be the final arbiter when legislative intent is called into question.[2]

---

[1]Both *Daily Herald Co. v. Department of Employment Security*, 91 Wn.2d 559, 588 P.2d 1157 (1979) and *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 525 P.2d 774 (1974) involved state agency determinations; accordingly, judicial review was conducted under the "error of law" yardstick of the administrative procedures act, RCW 34.04.130(6)(d). Although review in the instant case was by writ of certiorari, we see no real difference between the terms "acting illegally," (RCW 7.16.040), "contrary to existing law," (*Helland v. King County Civil Serv. Comm'n*, 84 Wn.2d 858, 529 P.2d 1058 (1975)), and "error of law," (RCW 34.04.130(6)(d)).

[2]WAC 197–10–020(1) and (2) read as follows:

There is therefore no sound reason for any reviewing court to defer to the Board's interpretation of SEPA in this instance. *See Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978); *Carpenter v. Island County, supra.*

■ After viewing RCW 43.21C.030(2)(c) in the light of the SEPA guidelines,[3] we must conclude the Board incorrectly interpreted that statute when it considered that Short's proposal included his speculative plans to build

---

"Purpose. (1) The purpose of this chapter is to establish statewide guidelines interpreting and implementing the state environmental policy act of 1971 (SEPA). Each state and local agency of government must adopt its own rules, ordinances or resolutions consistent with this chapter governing the implementation of SEPA.

"(2) These guidelines were developed to establish methods and means of implementing SEPA 'in a manner which reduces duplicative and wasteful practices, establishes effective and uniform procedures, encourages public involvement, and promotes certainty with respect to the requirements of the act'."

[3]WAC 197–10–040(29) reads as follows:

"Definitions. The following words and terms have the following meanings for the purposes of this chapter, unless the context indicates otherwise:

" . . .

"(29) Proposal means a specific request to undertake any activity submitted to, and seriously considered by, an agency or a decision–maker within an agency, as well as any action or activity which may result from approval of any such request. The scope of a proposal for the purposes of lead agency determination, the threshold determination, and impact statement preparation is further defined in WAC 197–10–060."

WAC 197–10–060(2)(a) and (b) provide:

"Scope of a proposal and its impacts for the purposes of lead agency determination, threshold determination, and EIS preparation. (1) The proposal considered by an acting agency during the lead agency determination procedure, and by the lead agency during the threshold determination and EIS preparation, shall be the total proposal including its direct and indirect impacts. Whenever the word 'proposal' or the term 'proposed action' is used in this chapter, the discussion in subsection (2) of this section applies. In considering the environmental impacts of a proposal during the threshold determination and EIS preparation, the discussion in subsection (3) of this section applies.

"(2) The total proposal is the proposed action, together with all proposed activity functionally related to it. Future activities are functionally related to the present proposal if:

"(a) The future activity is an expansion of the present proposal, facilitates or is necessary to operation of the present proposal; or

"(b) The present proposal facilitates or is a necessary prerequisite to future activities."

other warehouses. The Board was asked only to issue a permit authorizing a change of use for the existing building. No other results were requested by Short nor could any flow from a granting of the permit. Thus, permit issuance was the only "action," the possible total effect of which upon the environment the Board was called upon to assess for EIS purposes. *See Carpenter v. Island County, supra.* In this case, the extent or scope of the "action" could only be as broad as Short's proposal. Unlike the situation in *Juanita Bay,* Short's proposal did not request from the Board

the first government authorization of any part of a project or series of projects which, when considered cumulatively, constitute a major action "significantly affecting the quality of the environment . . ." RCW 43.21C.030(c).

*Juanita Bay Valley Community Ass'n v. Kirkland, supra* at 72–73.

As stated in *Cheney v. Mountlake Terrace,* 87 Wn.2d 338, 552 P.2d 184 (1976), at page 344:

The legal issue is whether the possible future development of the private parcel is an environmental consequence which the City must evaluate at this time. This question stems from the mandate of RCW 43.21C-.030(2)(c) that major actions significantly affecting the quality of the environment require an environmental impact statement, the content of which is described in quite broad terms by the statute.

Implicit in the statute is the requirement that the decision makers consider more than what might be the narrow, limited environmental impact of the immediate, pending action. The agency cannot close its eyes to the ultimate probable environmental consequences of its current action. *See Eastlake Community Council v. Roanoke Associates, Inc.,* 82 Wn.2d 475, 513 P.2d 36 (1973); *Loveless v. Yantis,* 82 Wn.2d 754, 513 P.2d 1023 (1973). On the other hand, it is impractical if not impossible to identify and evaluate every remote and speculative consequence of an action.

The mandate of SEPA does not require that every remote and speculative consequence of an action be

included in the EIS. The adequacy of an EIS must be judged by application of the rule of reason. This is the approach adopted by the federal courts. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974); *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 837 (D.C. Cir. 1972).

In the instant case the rule of reason dictates that any further assessment of the environmental consequences of Short's plans be deferred until he presents them in specific proposal form, requesting governmental action. *Carpenter v. Island County, supra.*

We also agree with the trial court that the Board acted in disregard of WAC 197–10–170(1)(c) and its own ordinance No. 56–1974, both of which classify Short's barn–cum–warehouse as a categorical exemption from EIS requirements. It was error for the Board to consider Short's embryonic plan to build additional structures as a part of his proposal, and therefore the Board acted contrary to law when it required him to prepare an EIS for his contemplated change of use. As the structure now stands it is categorically exempt; even if a change of use is permitted it will remain categorically exempt. *See Carpenter v. Island County, supra.*

■ In a last–ditch effort to defend its action, the County argues that Short resorted to a subterfuge when he obtained permission to build a barn and instead built a warehouse. The County reasons that Short's misrepresentations render the permit invalid and that void permits confer no rights. *See Eastlake Community Council v. Roanoke Assocs., Inc.,* 82 Wn.2d 475, 513 P.2d 36, 76 A.L.R.3d 360 (1973). The result would be that Short cannot seek a change of use permit for his building because it does not legally exist. We think the trial judge provided an answer to this argument when he observed:

The plaintiff has by means, which can only be classified as devious, sought to circumvent the provisions of the county's environmental ordinance, when in truth and in fact, *the ordinance by its very terms exempts the*

*activity in which the plaintiff engaged from the provisions of that ordinance.* See Ordinance No. 56–1974, sec. 3(c). The plaintiff has constructed a storage building designed for an occupant load of 25 persons or less and with less than 2,500 square feet of storage area. Section 3(c) specifically makes this work exempt.

(Italics ours.)

Finally, our decision is addressed solely to the narrow issue of whether Short's proposal required an EIS. Our resolution of that issue in his favor in no way mandates the Board to issue a change of use permit without considering all applicable state and local requirements for such a permit.

The judgment of the trial court is affirmed.

PEARSON, C.J., and PETRIE, J., concur.