[No. 13016-1-I. Division One. August 19, 1985.]

MURDEN COVE PRESERVATION ASSOCIATION, *Appellant,* v. KITSAP COUNTY, ET AL, *Respondents.*

---

516

*Smith, Brucker, Winn & Ehlert* and *Charles E. Ehlert*, for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Patricia Schafer, Deputy,* for respondent Kitsap County.

*J. Frederick Simpson,* for respondents Gregg and Brown.

SWANSON, J.—This case involves a rezone of and proposed planned unit development (PUD) for a 4.39–acre parcel of real property on Bainbridge Island. Murden Cove Preservation Association[1] appeals the superior court judgment (1) affirming the Kitsap County Board of Commissioners' decision that approved the rezone and planned unit development and (2) denying Murden Cove's requests for an injunction, attorney fees, and costs. Murden Cove claims that the Board's decision was unlawful, arbitrary and capricious and clearly erroneous. We affirm.

On July 21, 1981, Gary L. and Diane Brown applied for approval of a rezone of the subject property from Rural Undeveloped to Light Manufacturing and of a proposed PUD adding a mini–warehouse and a furniture manufacturing facility to the site. The property is bounded on the east by Highway 305, the island's major thoroughfare, on the west by Sportsman's Club Road, and on the south by undeveloped land. Existing uses on the subject property are

---

[1]Murden Cove Preservation Association is a nonprofit association, organized under Washington laws, whose members are residents and property owners on Bainbridge Island, Kitsap County, Washington, who live on and own property around Murden Cove in the vicinity of the proposed "Sportsman's Park" planned unit development.

a garbage truck storage and maintenance facility and an approved future wholesale glass business, and north of the property are a power substation and a church. The surrounding land is zoned Rural Undeveloped except for a parcel across Highway 305 and a parcel northwest of the site, which are zoned RS–20,000 and RS–35,000, respectively.

The Browns own the entire 11.7–acre tract of land south of the power substation, of which the subject property forms the southernmost part.[2] In 1980 the Browns received an Unclassified Public Use Permit for the 11.7–acre tract, which permit allows the garbage truck facility and wholesale glass company but not the two additional proposed uses, for which a rezone is thus required.

The Kitsap County Community Development Department issued a declaration of environmental nonsignificance under the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, and subsequently recommended approval of both the rezone and PUD. The county hearing examiner's recommendation to approve the rezone and PUD, subject to 13 conditions, was upheld on appeal by the Kitsap County Board of Commissioners.

Seeking injunctive and declaratory relief, Murden Cove filed a petition for a writ of review in King County Superior Court pursuant to RCW 36.01.050, permitting an action against a county to be filed in an adjoining county. Upon review, the Superior Court affirmed the Board's decision and denied the requests for an injunction, attorney fees, and costs.

The issues on appeal are (1) whether the County's approval of the rezone was illegal spot zoning and (2) whether under SEPA an environmental impact statement was required for the rezone of a 4.39–acre parcel of land on

---

[2]The Browns' 11.7–acre real property, located about 1,300 feet from Murden Cove, is separated from the cove by Highway 305 and Moran Road. The cove and the salmon–spawning stream flowing into it are designated as an environmentally sensitive area in the Kitsap County Comprehensive Plan; however, the Browns' property is not so designated.

Bainbridge Island from Rural Undeveloped to Light Manufacturing and for a PUD adding a mini–warehouse and a furniture factory to the site.

## REZONING

■ An appellate court will overturn a governmental body's rezoning decision only if the decision is arbitrary or capricious. *Kenart & Assocs. v. Skagit Cy.*, 37 Wn. App. 295, 298, 680 P.2d 439, *review denied*, 101 Wn.2d 1021 (1984); *Pentagram Corp. v. Seattle*, 28 Wn. App. 219, 228, 622 P.2d 892 (1981). Arbitrary and capricious action has been defined as

> willful and unreasonable action, without consideration and [in] disregard of facts or circumstances. Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration though it may be felt that a different conclusion might have been reached.

*Barrie v. Kitsap Cy.*, 93 Wn.2d 843, 850, 613 P.2d 1148 (1980), quoted in *Thomsen v. King Cy.*, 39 Wn. App. 505, 515, 694 P.2d 40 (1985).

Claiming that the County's action was arbitrary and capricious and constituted illegal spot zoning, Murden Cove assigns error to the following finding of fact and conclusions of law:

> 3.8 Since the original zoning classification of this property in 1970, there have been additional approved uses in this area on contiguous property sold or developed by the developers including the Puget Sound Substation, the UPU approval permitting the storage and maintenance of garbage trucks and the establishment of a glass manufacturing company on or near this site warranting a rezone of this parcel to light manufacturing.

Finding of fact 3.8.

> 4.1 Approval of the subject rezone promotes the general welfare in providing increased diversified employment on Bainbridge Island, Kitsap County, Washington.
>
> 5.1 Rezoning the subject parcel from undeveloped land to light manufacturing complies with the intent, the goals and policies of the Kitsap County Comprehensive Land

Use Plan—1977 and the Bainbridge Island Subarea Plan (1980).

6.1 Since the original zoning classification of this parcel there has been a change in circumstances in that there have been additional approved commercial uses on the site and in the adjacent area and there has been a change in the goals and policies of the underlying comprehensive land use plans.

9.2 The Board of County Commissioners' decision in approving the rezone and PUD affirming the recommendation of the hearing examiner is not arbitrary and capricious.

Conclusions of law 4.1, 5.1, 6.1, and 9.2.

 Our Supreme Court has set forth the test for illegal spot zoning:

Spot zoning is zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from, and inconsistent with, the classification of surrounding land and not in accordance with the comprehensive plan. When faced with a rezone challenge, our main inquiry is whether the zoning action bears a substantial relationship to the general welfare of the affected community.

*Save a Neighborhood Env't v. Seattle*, 101 Wn.2d 280, 286, 676 P.2d 1006 (1984) (*SANE*). The proponents of a rezone bear the burden of showing that conditions have substantially changed since the original zoning or the most recent amendment. *Woodcrest Invs. v. Skagit Cy.*, 39 Wn. App. 622, 627, 694 P.2d 705 (1985) (citing *Parkridge v. Seattle*, 89 Wn.2d 454, 462, 573 P.2d 359 (1978)). Moreover,

[o]nly where the spot zone grants a discriminatory benefit to one or a group of owners to the detriment of their neighbors or the community at large without adequate public advantage or justification will the County's rezone be overturned.

*Save Our Rural Env't v. Snohomish Cy.*, 99 Wn.2d 363, 368, 662 P.2d 816 (1983), quoted in *SANE*.

Under the *SANE* test, the County's action did not constitute illegal spot zoning. Substantial evidence in the record supports the trial court's finding that since the sub-

ject property's original 1970 zoning classification, approved uses on the subject and contiguous property have included the power substation, garbage truck facility and wholesale glass company so that the subject property's rezone to Light Manufacturing would not create a use classification totally different from or inconsistent with the surrounding land's approved uses.

Further, the rezone to Light Manufacturing, which permits a mini–warehouse and a furniture manufacturing facility, would promote the public welfare by providing diversified employment opportunities for the local labor force while preserving the island's small town character to achieve the goal of a balanced community. See Policy EP–3, Bainbridge Island Subarea Plan (BISP), at 22. In addition, numerous conditions were attached to the rezone approval to carry out the Bainbridge Island Subarea Plan's light manufacturing goal of providing for

an area where low impact industrial activities can be concentrated where access, traffic congestion, visual and other impacts on the surrounding neighborhood can be minimized.

The conditions imposed to minimize the impact on the neighborhood included a ban on any retail use, 50– and 25–foot vegetative buffer strips on the boundaries, on–site sign limitations, and no smoke, dust, odor, noise, heat or intense light discernible beyond the subject property's boundaries.

Moreover, the rezone is in accord with the County's 1977 comprehensive land use plan, as refined by the BISP, which was adopted by the County in 1980. The comprehensive plan adopted the urban concentration concept, which seeks to concentrate urban types and intensities of development near existing urban areas with already existing or soon–to–be–provided services. Intensity refers to the degree of land use without regard to the type of use and may be expressed in terms of the amount of land covered by buildings, roads, parking lots, etc., building height, number of people or dwelling units per acre, percent of undeveloped land in a given area, and volume of traffic generated.

Here the subject property, located about 1.5 miles from Winslow, the island's urban center, has water and electrical services and access to the island's major highway. Moreover, the proposed PUD would add to the subject property a one–story 5,000–square–foot building for furniture manufacturing and a one–story 3,900–square–foot mini–warehouse. Further, since any retail use is prohibited, the traffic that would be generated by the proposed PUD is relatively minimal.

Moreover, the BISP states regarding the New Brooklyn neighborhood in which the subject property is located:

> The area along New Brooklyn Road and Sportsman Club Road east to Winslow . . . should only be developed with care, since this area forms a natural western boundary for the Winslow area. As such it is the boundary between the Rural area to the west and the developing areas adjacent to Winslow. Sportsman Club Road should also be considered a major boundary feature. All land west of this road should be left in Rural. Most of the land east of Sportsman Club Road should be permitted to develop at up to 2 d.u./acre (plus 20% bonus). *The cleared northern portion of the triangle east of Sportsman Club Road should probably be used for some non–residential use that can be buffered from SR–305 and adjacent residential development.*

(Italics ours.) The BISP further states that while residential zoning should be adopted along with the plan, nonresidential zoning should only be recommended with rezones to occur on a case–by–case basis with a PUD. Here conditional approval of a rezone to Light Manufacturing, along with a proposed PUD, for property recommended for a nonresidential use under the BISP is consistent with the comprehensive plan.

Substantial evidence supports the trial court's conclusion that since the original zoning classification of the subject property, a change in circumstances has resulted from the approved commercial uses on the subject property and in the adjacent area and from a change in the underlying comprehensive land use plan. The respondents have carried

their burden of showing a sufficient change in the neighborhood that would justify a rezone in the public interest. *Woodcrest*, at 627–28.

## NEGATIVE THRESHOLD DETERMINATION

 Murden Cove contends that the negative threshold determination of the environmental significance of the rezone and PUD was clearly erroneous. A governmental agency's threshold determination of no environmental significance is subject to review under the clearly erroneous standard. *Norway Hill Preserv. & Protec. Ass'n v. King Cy. Coun.*, 87 Wn.2d 267, 275, 552 P.2d 674 (1976), cited in *Sisley v. San Juan Cy.*, 89 Wn.2d 78, 84, 569 P.2d 712 (1977).

> "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

*Ancheta v. Daly*, 77 Wn.2d 255, 259–60, 461 P.2d 531 (1969), quoted in *Norway Hill*, at 274.

Judicial review under RCW 34.04.130(6)(e)'s clearly erroneous standard requires an examination of the entire record in light of the public policy contained in the legislation authorizing the decision. *Norway Hill*. SEPA, an environmental full disclosure law, promotes

> the policy of fully informed decision making by government bodies when undertaking "major actions significantly affecting the quality of the environment." *See* RCW 43.21C.010; RCW 43.21C.030.

*Norway Hill*, at 272. The determination that an action is not a major action significantly affecting the quality of the environment means that a detailed environmental impact statement (EIS) is not required before the action is taken or the decision is made. *Norway Hill*, at 273.

Nevertheless, where a governmental agency makes a negative threshold determination, it must show "'that environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA.'" *Sisley*, at 84 (quoting *Juanita*

*Bay Vly. Comm'ty Ass'n v. Kirkland,* 9 Wn. App. 59, 73, 510 P.2d 1140 (1973)). Further,

Upon review of a negative threshold decision, a reviewing court must be mindful that "the decision of the governmental agency shall be accorded substantial weight." RCW 43.21C.090.

*Hayden v. Port Townsend,* 93 Wn.2d 870, 880, 613 P.2d 1164 (1980), *overruled on other grounds in Save A Neighborhood Env't v. Seattle,* 101 Wn.2d 280, 286 n.1, 676 P.2d 1006 (1984).

The issue here is whether the negative threshold determination was clearly erroneous because the approval of the rezone and proposed PUD was a "major [action] significantly affecting the quality of the environment" such that an EIS was required under RCW 43.21C.030(2)(c). A major action significantly affects the environment, triggering the EIS requirement, "whenever more than a moderate effect on the quality of the environment is a reasonable probability." *Norway Hill,* at 278.

Here the record reveals that before the governmental decision was made, environmental and socioeconomic factors were considered based upon extensive information that was obtained. *See Barrie v. Kitsap Cy.,* 93 Wn.2d 843, 858–59, 613 P.2d 1148 (1980). Moreover, an examination of the entire record in light of SEPA's public policy does not lead to the firm conviction that a mistake has been committed.

First, as noted in the trial court's unchallenged finding of fact 4.3, here the application and required environmental checklist were supplemented with additional information that was made part of the record and discussed (1) the expected traffic to be generated by the two proposed uses in addition to the prior uses approved along with the Unclassified Public Use Permit (UPUP); (2) the available water, sewage and electrical services; (3) the allowable residential use density on the property; (4) the proposed users' business operations and need for a site on the island; and (5) the island's current residential real estate market and other available light manufacturing sites.

Moreover, the application contained mitigative measures to lessen the impact on the surrounding area, which measures were subsequently made conditions of approval. These measures included nonretail uses, 50– and 25–foot vegetative boundary buffer strips, a drainage plan to approximate predevelopment surface water discharge, and construction erosion control measures. The imposition of protective conditions is not by itself sufficient to require an EIS in the absence of more than a moderate effect on the environmental quality. *Richland Homeowner's Preserv. Ass'n v. Young,* 18 Wn. App. 405, 414 n.4, 568 P.2d 818 (1977) (citing *Norway Hill,* at 279).

Information was obtained from the county Public Utility District No. 1 regarding water service and from the county Public Works Department regarding the traffic effects and the preliminary surface water drainage plan. The county Community Development Department, which issued the declaration of nonsignificance, had information regarding surrounding properties' zoning and uses and the approved uses under the UPUP for the applicants' entire 11.7–acre tract of land.

An examination of the entire record does not lead to the conclusion that a mistake was committed. Assuming, arguendo, that the approval is a "major action," it cannot be said that a reasonable probability exists that the governmental action will have a more than moderate effect on the surrounding environment considering the subject property's location and the approved uses permitted under the UPUP granted to the entire tract of land. Moreover, where a declaration of nonsignificance is not clearly erroneous, no consideration of alternative sites is required under RCW 43.21C.030(2)(c)(iii). *San Juan Cy. v. Department of Natural Resources,* 28 Wn. App. 796, 801, 626 P.2d 995 (1981).

██ Murden Cove's contention that the County's action here constituted "piecemeal review" in violation of SEPA lacks merit.[3]

---

[3]WAC 197–10–060(1) and (2) provide in part:

Piecemeal review is permissible if the first phase of the project is independent of the second and if the consequences of the ultimate development cannot be initially assessed.

*Cathcart–Maltby–Clearview Comm'ty Coun. v. Snohomish Cy.*, 96 Wn.2d 201, 210, 634 P.2d 853 (1981).

Piecemeal review is impermissible where a "series of interrelated steps [constitutes] an integrated plan" and the current project is dependent upon subsequent phases. *Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 345, 552 P.2d 184 (1976). Further, the assessment of a proposed action's environmental effects must include its direct as well as "reasonably anticipated indirect impacts";

subsequent development of a similar nature, however, need not be considered in the threshold determination unless there will be some causal connection between this development and one or more of the governmental decisions necessary for the proposal in question.

WAC 197–10–060(3). Here the approval of the rezone and proposed PUD has not been shown to be dependent upon, functionally related to, or causally connected to any future development of the applicants' property.

Further, in the absence of specific plans for any future development, SEPA does not require consideration of "every remote and speculative consequence of an action." *Short v. Clallam Cy.*, 22 Wn. App. 825, 834, 593 P.2d 821

---

"(1) The proposal considered by . . . the lead agency during the threshold determination and EIS preparation, shall be the total proposal including its direct and indirect impacts. . . .

"(2) The total proposal is the proposed action, together with all proposed activity functionally related to it. Future activities are functionally related to the present proposal if:

"(a) The future activity is an expansion of the present proposal, facilitates or is necessary to operation of the present proposal; or

"(b) The present proposal facilitates or is a necessary prerequisite to future activities.

". . . The fact that future parts of a proposal will require future governmental approvals shall not be a bar to their present consideration, so long as the plans for those future parts are specific enough to allow some evaluation of their potential environmental impacts."

(1979) (quoting *Cheney,* at 344). In this case the rule of reason dictates that any assessment of the environmental consequences of the applicants' future plans be deferred until they are presented in a specific form for requested governmental action. *Short,* at 835.

The judgment is affirmed.

COLEMAN and WEBSTER, JJ., concur.