[No. 37303-3-II. Division Two. September 3, 2009.]

SCOTT MERRIMAN ET AL., *Appellants*, v. PAUL COKELEY ET AL., *Respondents*.

*Thomas F. Miller*; and *Jay A. Goldstein* and *Carmen R. Rowe Hoogkamer* (of *Jay A. Goldstein Law Office, PLLC*), for appellants.

*Robert K. Valz, Jr.* (of *Valz Houser Kogut & Barnes, PS*), for respondents.

¶1 HUNT, J. — Scott and Kim Merriman appeal the trial court's order quieting title to a disputed triangle of land in their neighbors, Dianne and Paul Cokeley. The Merrimans argue that they acquired title to the triangle through the doctrine of mutual recognition and acquiescence or, in the

alternative, by adverse possession. The Cokeleys cross-appeal, arguing that the trial court erred by failing to award them attorney fees. We (1) reverse the trial court's order quieting title to the disputed triangle in the Cokeleys, (2) remand to the trial court to quiet title to that triangle in the Merrimans, and (3) affirm the trial court's order denying the Cokeleys attorney fees and costs.

## FACTS

### I. Disputed Triangle

¶2 Scott and Kim Merriman and Dianne and Paul Cokeley[1] own adjacent lots abutting Puget Sound off Steamboat Island Road in the Olympia area. The legal description of the Merrimans' lot is "Lot 10 in Block 1 of the Plat of Edgewater Beach as recorded in Volume 11 of Plats at Page 30, Records of Thurston County, Washington." Clerk's Papers (CP) at 5. The legal description of the Cokeleys' lot is "Lot 11 in Block 1 of the Plat of Edgewater Beach as recorded in Volume 11 of Plats at Page 30, Records of Thurston County, Washington." CP at 5. The Merrimans purchased Lot 10 from Dan Kosenski in 1996. The Merrimans live in a house on Lot 10. The Cokeleys purchased Lot 11 from Rita Willits in May 2004. Lot 11 is undeveloped.

¶3 In 1993, Ward Willits, Rita Willits' husband, hired the surveying firm Hansen and Swift, Inc., to locate the boundary line between Lots 10 and 11. Hansen and Swift placed three survey markers on what it determined was the boundary line between the two lots (the Hansen and Swift survey line), but they did not record the survey. Hansen and Swift placed one survey marker at the road, another at the top of a bluff (close to the shoreline edge of the property), and the third approximately midway between the markers at the ends of the property line. A few months after this

---

[1] We occasionally refer to the parties by their first names for clarity; we mean no disrespect.

survey, Ward Willits placed a wooden post next to each of the corner survey markers, and he placed an additional metal stake halfway along the north property line.

¶4 From 1993 to 2002, no one made any changes along the boundary line between Lots 10 and 11. During those years, blackberry bushes, weeds, and ivy grew over the Hansen and Swift survey line. In 2002, Ward Willits erected a two-strand barbed wire fence on or near the Hansen and Swift survey line.[2]

¶5 Before the Cokeleys bought Lot 11, the Merrimans had discussed with Willits the possibility of purchasing Lot 11. In 2004, after the Merrimans learned that the Willits had sold Lot 11 to the Cokeleys, the Merrimans installed wood privacy screens and improved the planting along the property line to enhance their privacy. The Merrimans also "began a course of regular communication with the Thurston County Building and Development Department regarding the use of Lot 11" because the Merrimans objected to the Cokeleys' using Lot 11 for residential purposes and had concerns about drainage, vegetation, and the size of the Cokeleys' proposed home. CP at 74. Ultimately, the Thurston County Building and Development Department approved permits for the Cokeleys to build a single family residence on Lot 11.[3]

¶6 In 2006, the Cokeleys hired the survey firm Bracy & Thomas to survey the boundary line between Lots 10 and 11. In the course of the survey, Bracy & Thomas found the

---

[2] It is not clear from the findings of fact whether the barbed wire fence was actually on the survey line or within inches of the survey line. The trial court found:

> Willits erected a two strand barb wire fence. Willits placed strands of barb wire from the Hansen and Swift [survey markers] between Lots 10 and 11. As was his usual way of fencing, Willits placed the "T" posts on the inside of the property line or further into Lot 11.

CP at 73-74. But Willits testified that he had used the wood and metal posts he put up shortly after the 1993 survey as supports for the barbed wire fence.

[3] According to the Cokeleys, the Thurston County Building and Development Department will void the permits allowing them to build and to install a septic system if we hold that the Merrimans acquired title to the disputed triangle.

three Hansen and Swift survey markers. Bracy & Thomas further discovered that Hansen and Swift had incorrectly placed two of the survey markers. The survey marker closest to the road is in the correct place. But the Hansen and Swift survey marker in the middle of the of the boundary is 0.9 feet (11 inches) into Lot 11 from the true boundary line, and the survey marker at the far end of the property is 1.7 feet (20 inches) inside the true boundary line on the Lot 11 side. According to Bracy & Thomas, Hansen and Swift must have erroneously turned 90 degrees off the road even though the plat angle was actually "eighty-nine thirty."

## II. PROCEDURE

¶7 On November 14, 2006, the Merrimans sued the Cokeleys to quiet title to the triangular area between their respective lots' true boundary and the Hansen and Swift survey line. The Merrimans asserted they had gained ownership of the triangular area through adverse possession, estoppel in pais,[4] or mutual recognition and acquiescence. They also placed a lis pendens[5] in the chain of title for Lot 11 on the same day they filed this lawsuit. The Cokeleys counter-claimed, asking the trial court (1) to dismiss the Merrimans' claims with prejudice; (2) to quiet title to the disputed triangle according to the 2006 Bracy & Thomas survey; (3) to award them $50,000 in damages for slander of

---

[4] "Estoppel in pais" is a method for altering title to land:

["Estoppel in pais"] requires three elements: "(1) [a]n admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act."

*Lilly v. Lynch*, 88 Wn. App. 306, 318, 945 P.2d 727 (1997) (second alteration in original) (quoting *Burkey v. Baker*, 6 Wn. App. 243, 248, 492 P.2d 563 (1971)).

[5] A plaintiff in an action affecting real property may file a "lis pendens" with the auditor of the county in which the property is situated. RCW 4.28.325. In this context, a "lis pendens" is "a notice of the pendency of the [legal] action, containing the names of the parties, the object of the action and a description of the real property in that county affected thereby." *Id.*

title and intentional interference with a business relationship; and (4) to cancel the lis pendens the Merrimans had placed in the Lot 11 chain of title.

¶8 On November 9, 2007, the Cokeleys served the Merrimans with an offer of settlement, offering to agree that the Merrimans had acquired title to a portion of the disputed triangle through adverse possession.[6] The Merrimans did not accept this offer.

### A. Bench Trial

¶9 At a November 20 bench trial, witnesses generally testified to the facts as we described above based on the trial court's findings of fact. The trial court made no findings of fact about the credibility of the Merrimans' undisputed testimony that they had maintained their property up to the Hansen and Swift survey line or Willits' undisputed testimony about his beliefs regarding the property line location.

¶10 The following testimonies are significant: Kim Merriman testified that (1) she and Scott maintained the area near the property line (as indicated by the Hansen and Swift survey markers) by watering and fertilizing the grass and by clipping ivy and blackberry bushes that encroached onto their side of the property line; and (2) she and Scott had observed "the staking boundary" (the Hansen and Swift survey line) when they were mowing and cutting weeds.

¶11 Scott Merriman testified that (1) when he inspected the property before purchasing it, he had observed the Hansen and Swift survey markers and metal posts marking that line; (2) their (the Merrimans') maintenance under the tree canopy consisted of "pruning limbs off the trees, maintaining the trees, [and] picking up branches from a

---

[6] The Cokeleys also offered to agree that the Merrimans had acquired title to a concrete pad and a fire pit, which are not at issue here. The trial court's order reflects the parties' agreement that the pad and fire pit belong to the Merrimans.

variety of wind storms," Report of Proceedings (RP) (Nov. 20, 2007) at 123; (3) they planted ferns and other "native plant species that would typically grow under a forest canopy," RP (Nov. 20, 2007) at 121; and (4) he and Kim did maintenance along the property line, including mowing, and trimming blackberries and ivy.

¶12 Willits testified that (1) he understood the Hansen and Swift survey line to be the boundary line between Lots 10 and 11; (2) after the 1993 Hansen and Swift survey, he and his wife "decided that that was a correct survey"; and (3) when he erected the fence in 2002, he had cleared the area with a hand-held, gas brush cutter and the Hansen and Swift survey markers were "fairly obvious" because he had marked them in 1993 or 1994. In response to cross-examination about that specific portion of the property, Willits stated that this portion of the property line was heavily forested and that he had not observed any grass being grown or mowed in the forested area of the property line.

¶13 Paul Cokeley testified that (1) when he inspected Lot 11 before purchasing it, he had observed the stakes (which Willits had set on the Hansen and Swift survey line) at the road and on the bank; (2) he understood that those stakes indicated the boundary between Lots 10 and 11; and (3) he understood the boundary line between the lots to be the Hansen and Swift survey line until Bracy & Thomas notified him of the true boundary line (according to the plat) in 2006.

## B. Motion for Attorney Fees

¶14 On December 3, the Cokeleys moved for an award of attorney fees and costs under chapter 4.84 RCW, CR 68, and RCW 4.28.328(3). The trial court found that the Cokeleys had made an offer of settlement that the Merrimans did not accept, but it concluded that chapter 4.84 RCW, CR 68, and RCW 4.28.328(3) did not apply and, thus, the Cokeleys were not entitled to attorney fees or costs.

## C. Findings of Fact and Conclusions of Law

¶15 On January 4, 2008, the trial court found facts as laid out in the above section titled "Disputed Triangle." The trial court also found that (1) "[p]rior to the August 9, 2006 survey by Bracy [&] Thomas, there had been no regular use by either party of the disputed area between Lot[s] 10 and 11," CP at 76 (Finding of Fact 21); (2) "[d]uring 1993 to 2002, there was no clear establishment of a boundary line between Lots 10 and 11," CP at 73 (Finding of Fact 10); and (3) "[a] review of photographic exhibits and testimony make clear that there is no clearly nor well defined grooming or vegetation line between the two parcels," CP at 77 (Finding of Fact 28). Based on these findings, the trial court concluded that the Merrimans had "failed to present proof by clear and convincing evidence that they acquired title to [the disputed triangle] by adverse possession or mutual acquiescence." CP at 78.

¶16 The trial court also concluded that the Cokeleys had failed to prove (1) their claims for slander of title or intentional interference with a business relationship, or (2) that the Merrimans did not file their lis pendens claims in good faith. Nevertheless, the trial court ruled that the lis pendens should be removed. And the trial court determined that neither party was entitled to attorney fees.

## D. Motions To Reconsider and for Stay of Judgment

¶17 The Merrimans filed a motion to reconsider, which the trial court denied. The Merrimans also moved to stay execution of the trial court's judgment pending appeal. In response, the trial court ordered the parties not to "add to or remove or modify the vegetation in the disputed area . . . during the period of appeal, if any." CP at 150-51. The trial court stayed its judgment with respect to the lis pendens for a five-day period to give the Merrimans time to request a stay from the Court of Appeals. Our court commissioner

granted the Merrimans' request, stayed the trial court's judgment, and permitted the Merrimans to place another lis pendens[7] in the chain of title to the Cokeley property, provided that the Merrimans file a supersedeas bond in the amount of $395,000.

¶18 The Merrimans appeal, and the Cokeleys cross-appeal.

## ANALYSIS

### I. Merrimans' Appeal

#### A. Standard of Review

¶19 We review findings of fact and conclusions of law to determine whether substantial evidence supports the trial court's findings and, if so, whether the findings support the conclusions of law. *Scott v. Trans-Sys., Inc.*, 148 Wn.2d 701, 707-08, 64 P.3d 1 (2003). Substantial evidence is a quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). If the evidence satisfies this standard, we will not substitute our judgment for that of the trial court, even though we might have resolved a factual dispute differently. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003) (citing *Croton Chem. Corp. v. Birkenwald, Inc.*, 50 Wn.2d 684, 314 P.2d 622 (1957)). We review findings of fact erroneously labeled "conclusions of law" as findings of fact, and conclusions of law labeled "findings of fact" as conclusions of law. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

#### B. Mutual Recognition and Acquiescence

¶20 To establish the doctrine of mutual recognition and acquiescence, the plaintiff must establish the following elements by clear, cogent, and convincing evidence:

---

[7] According to our commissioner, the previously filed lis pendens "was apparently lifted on January 9, 2008."

"(1) The line must be certain, well defined, and in some fashion physically designated upon the ground, *e.g.*, by monuments, roadways, fence lines, etc.; (2) in the absence of an express agreement establishing the designated line as the boundary line, the adjoining landowners, or their predecessors in interest, must have in good faith manifested, by their acts, occupancy, and improvements with respect to their respective properties, a mutual recognition and acceptance of the designated line as the true boundary line; and (3) the requisite mutual recognition and acquiescence in the line must have continued for that period of time required to secure property by adverse possession."

*Lilly v. Lynch*, 88 Wn. App. 306, 316, 945 P.2d 727 (1997) (quoting *Lamm v. McTighe*, 72 Wn.2d 587, 593, 434 P.2d 565 (1967)).

1. Well-defined line, designated upon the ground

 ¶21 The Merrimans argue that, as a matter of law, the 1993 Hansen and Swift survey line meets the first requirement of the mutual recognition and acquiescence doctrine because (1) the Hansen and Swift survey markers and the posts Willits placed in 1993 or 1994 marked the boundary line; (2) Willits, Scott Merriman, and Paul Cokeley all testified that they knew where the markers were; and (3) everyone believed the Hansen and Swift markers were on the boundary line. The Merrimans further argue that the trial court applied an incorrect legal standard when it concluded that the "lack of a fence or some other object visible in the photographs meant that there was no 'clear or well defined boundary.' "[8] Br. of Appellant at 24.

¶22 The Merrimans also assign error to finding of fact 21, that "[p]rior to 2002, there had been no boundary line marker, structure, fence, trail or any other designation of

---

[8] In so arguing, the Merrimans also contend that several of the trial court's findings of fact regarding the absence of a well-defined line are actually conclusions of law. We agree and treat these erroneously labeled factual findings as legal conclusions.

use in the disputed area between Lots 10 and 11." CP at 76. They contend that the evidence does not support this finding and that it conflicts with the trial court's other findings of fact. We agree and hold that the findings of fact and the undisputed evidence do not support the trial court's legal conclusion that there was no well-defined boundary line between the two lots. On the contrary, the findings and evidence show, as a matter of law, that the Hansen and Swift survey markers created a well-defined line that was physically designated upon the ground.

¶23 Whether a line is well defined and physically designated upon the ground is a mixed question of fact and law: The location of survey stakes, fences, improvements, etc., is clearly a question of fact; but we determine the legal effect—whether any of those items create a line that is " 'certain, well defined, and in some fashion physically designated upon the ground' "—as a matter of law. *Lilly*, 88 Wn. App. at 316 (quoting *Lamm*, 72 Wn.2d at 593).

¶24 This element, which has remained unchanged since the *Lamm* court articulated it in 1967, requires that " '[t]he line must be certain, well defined, and in some fashion physically designated upon the ground, *e.g.*, by monuments, roadways, fence lines, etc.' " *Id.* (quoting *Lamm*, 72 Wn.2d at 593). Notably, the rule does not require a fence.

¶25 Here, the trial court's findings of fact conflict: The trial court found that (1) Hansen and Swift placed three survey markers along the purported property line; (2) Willits "placed two four inch round treated wooden posts adjacent to the corner survey [markers] in concrete," CP at 73 (Finding of Fact 8);[9] and (3) Bracy & Thomas located the Hansen and Swift survey markers in 2006. These findings establish that the Hansen and Swift survey line was " 'certain' " and " 'in some fashion physically designated upon the ground ... by monuments,' " thus meeting the first element of the mutual recognition and acquiescence doc-

---

[9] Willits testified that the purpose of these markers was "to make it obvious where the boundaries or the corners of [his] property were." RP (Nov. 20, 2007) at 89.

trine. *Lilly*, 88 Wn. App. at 316 (quoting *Lamm*, 72 Wn.2d at 593).

¶26 But in direct conflict with its survey marker findings, the trial court found that "[p]rior to 2002, there had been no boundary line marker, structure, fence, trail or any other designation of use in the disputed area between Lots 10 and 11." CP at 76 (Finding of Fact 21). The record supports the existence of the survey markers; thus, it does not support this finding of fact.

¶27 The trial court also found that (1) "[d]uring 1993 to 2002, there was no clear establishment of a boundary line between Lots 10 and 11," CP at 73 (Finding of Fact 10); (2) "[a] review of photographic exhibits . . . make[s] clear that the area between the [lots] does not have a clear nor well defined line or boundary," CP at 77 (Finding of Fact 26); and (3) "[a] review of photographic exhibits and testimony make clear that there is no clearly nor well defined grooming or vegetation line between the two parcels," CP at 77 (Finding of Fact 28). Although labeled as findings of fact, these are actually conclusions of law and we review them as such. *Willener*, 107 Wn.2d at 394. It appears that the trial court based these findings/conclusions on the overgrowth of blackberries, ivy, and weeds around the boundary line. But although the legal standard refers to " 'monuments,' " such as survey markers, it does not discuss vegetation, *Lilly*, 88 Wn. App. at 316 (quoting *Lamm*, 72 Wn.2d at 593); thus, in our view, the trial court applied an incorrect standard when it concluded that the line was not clear or well defined.

¶28 The trial court's findings of fact do not support its legal conclusion that the Hansen and Swift survey line was not "certain, well defined, and in some fashion physically designated upon the ground." The trial court found that the Hansen and Swift survey markers and Willits' posts existed on the Hansen and Swift survey line. Thus, as a matter of law, the Hansen and Swift survey line (1) was " 'certain' " and " 'in some fashion physically designated upon the ground . . . by monuments,' " and (2) satisfied the first

element of the mutual recognition and acquiescence doctrine. *Id.* (quoting *Lamm*, 72 Wn.2d at 593).

2. Manifestation of mutual recognition and acquiescence

¶29 The Merrimans also argue that the trial court applied the incorrect legal standard by requiring some affirmative use of the disputed property. Again, we agree.

¶30 To establish the second requirement, manifestation of the mutual recognition and acquiescence, the party asserting the doctrine must show that the parties (or their predecessors in interest) either (1) expressly agreed to the purported boundary line or (2) "in good faith manifested, by their acts, occupancy, and improvements with respect to their respective properties, a mutual recognition and acceptance of the designated line as the true boundary line." *Id.*

¶31 It is sufficient if the parties have

by their possessory actions with regard to their properties and the asserted line of division between them, a genuine and mutual recognition and acquiescence in the given line as the mutually adopted boundary between their properties.

*Lamm*, 72 Wn.2d at 593.

¶32 Where there is a fence between neighboring properties, " 'mere acquiescence in [the fence's] existence is not sufficient to establish a claim of title to a disputed strip of ground' "; instead, there must be some action showing that the neighbors recognize the fence as a boundary line. *Waldorf v. Cole*, 61 Wn.2d 251, 255, 377 P.2d 862 (1963) (quoting *Thomas v. Harlan*, 27 Wn.2d 512, 519, 178 P.2d 965 (1947)); *see also Houplin v. Stoen*, 72 Wn.2d 131, 136, 431 P.2d 998 (1967). In *Waldorf*, the court held there was a complete lack of proof that the parties had acquiesced in a rock barrier as signifying the property line where the disputed area "was apparently not used and was essentially in its original condition." 61 Wn.2d at 255. Although Cole had urged the court to find that the rock barrier was

Waldorf's idea of the boundary line, Waldorf denied that it was. *Id.* The theory behind the *Waldorf* holding is that a person may erect a fence for some other purpose than to mark a boundary line; thus, where the parties have not expressly agreed that the fence is the boundary line, there must be some evidence that they have acquiesced in it as the boundary line.

¶33 Where, as here, the property owners testify that they believed a given line to be the property line, the situation is more like an express agreement and we need not explore their acts and occupancy with respect to the disputed area. Furthermore, uncontroverted evidence of the Willits' and the Merrimans' actions supports their in-court testimonies that they believed the Hansen and Swift survey line was the property line: In 1993 or 1994, Willits installed posts on the survey line "to make it obvious where the boundaries or the corners of [his] property were." RP (Nov. 20, 2007) at 89. When Willits erected the fence in 2002, he did so on the Hansen and Swift line.[10] And when the Merrimans discovered Willits had sold Lot 11, removing the possibility that they (the Merrimans) could buy it, the Merrimans installed wood privacy screens and improved the planting along the Hansen and Swift boundary line in order to enhance their privacy.

¶34 Therefore, we hold that the Merrimans meet the second element: The parties or their predecessors in interest accepted and acquiesced in the Hansen and Swift survey line as the boundary line.

---

[10] The trial court actually found that Willits installed the fence "on the inside of the property line or further into Lot 11." CP at 73-74 (Finding of Fact 11). The Merrimans assign error to this finding of fact and argue that substantial evidence in the record does not support it. We need not reach this issue, however, because regardless of whether Willits placed the fence on the property line or just inside the property line, his placement of the fence indicates that he believed the Hansen and Swift survey line was the property line.

Either way, however, the Merrimans are correct. Although Willits testified that it was his "usual practice" to place a fence inside the property line, he also testified that when he erected *this* fence, he incorporated the poles he had installed on the property line in 1993 or 1994.

### 3. Time period

¶35 The time period to establish adverse possession and, thus, the period of time for mutual recognition and acquiescence, is 10 years. *Lilly*, 88 Wn. App. at 317. Here, the Merrimans clearly established that the owners of Lots 10 and 11 had mutually recognized and acquiesced in the Hansen and Swift survey line as the boundary line from 1993 until Bracy & Thomas performed another survey in 2006—a period of more than 10 years. Thus, the Merrimans meet this requirement. Because the Merrimans met all three doctrine of mutual recognition and acquiescence requirements, the trial court should have quieted title to the disputed triangle in the Merrimans.

### II. COKELEYS' CROSS APPEAL FOR ATTORNEY FEES

¶36 The Cokeleys argue that the trial court erred by denying their requests for costs under CR 68 and attorney fees under either RCW 4.84.250 or RCW 4.28.328(3). We review the trial court's decision to grant or to deny attorney fees for manifest abuse of discretion. *Lay v. Hass*, 112 Wn. App. 818, 826, 51 P.3d 130 (2002) (quoting *Mackey v. Am. Fashion Inst. Corp.*, 60 Wn. App. 426, 429, 804 P.2d 642 (1991)).

### A. CR 68 and RCW 4.84.250

¶37 The Cokeleys argue that the trial court erred by denying their request for costs under CR 68[11] and attorney fees under RCW 4.84.250[12] because the Merrimans' position after trial was less favorable than the

---

[11] CR 68 provides that (1) a defendant may make an offer of judgment at least 10 days before trial; and (2) if the plaintiff does not accept the offer, and obtains a final judgment that is not more favorable than the offer, the plaintiff must pay the costs that the defendant incurs after making the offer.

[12] Under RCW 4.84.250, the prevailing party may recover costs, including attorney fees, where the amount pleaded by that party is less than $10,000.

Cokeleys' pretrial settlement offer. Because we remand for the trial court to quiet title to the disputed parcel in the Merrimans and, thus, the Merrimans have obtained a final judgment more favorable than the Cokeleys' offer, we hold that the Cokeleys are not entitled to costs or attorney fees under either CR 68 or RCW 4.84.250.

## B. RCW 4.28.328

¶38 The Cokeleys also argue that the trial court erred by denying them attorney fees under RCW 4.28.328 because, although the Merrimans may have been justified in filing a lis pendens with regard to the disputed area, the Merrimans did not have substantial justification for filing the lis pendens on the entire lot. We disagree.

¶39 RCW 4.28.328(3) provides that, unless the person who files a lis pendens "establishes a substantial justification for filing the lis pendens," the trial court may, in its discretion, award "reasonable attorneys' fees and costs incurred in defending the action" to the aggrieved party. We review an award of attorney fees under a statute for abuse of discretion. *Bay v. Jensen*, 147 Wn. App. 641, 659, 196 P.3d 753 (2008).

¶40 The Cokeleys do not cite any authority for the proposition that the Merrimans were required to file a lis pendens with regard to only the disputed area. Nor were the Cokeleys able to answer our questions at oral argument about whether it is possible to place a lis pendens on only a portion of a lot. Furthermore, they have also argued that adjusting the boundary line to the Hansen and Swift survey line will render Lot 11 undevelopable because the Thurston County Building and Development Department will void their existing permits.[13] Given the significant impact on the use of the entire property, as the Cokeleys themselves allege, even if there exists a mechanism for placing a lis

---

[13] At trial, Paul Cokeley alluded that a "current moratorium on issuing permits" would make it very difficult to get new permits if the current permits were voided.

pendens on only part of a lot, the trial court did not abuse its discretion when it refused to award attorney fees under RCW 4.28.328.

¶41 We reverse the trial court's order quieting title to the disputed triangle in the Cokeleys, remand to the trial court to quiet title to this disputed triangle in the Merrimans, and affirm the trial court's order denying the Cokeleys attorney fees.

BRIDGEWATER, J., concurs.

¶42 ARMSTRONG, J. (dissenting) — Under the doctrine of mutual recognition and acquiescence, the property line must "be certain, well defined, *and* in some fashion physically designated upon the ground." *Lilly v. Lynch*, 88 Wn. App. 306, 316, 945 P.2d 727 (1997) (emphasis added) (quoting *Lamm v. McTighe*, 72 Wn.2d 587, 593, 434 P.2d 565 (1967)). For example, in *Lilly*, the court found that a north wall of a cement boat ramp constituted a well-defined line. *Lilly*, 88 Wn. App. at 309, 317. But in *Green v. Hooper*, 149 Wn. App. 627, 643-44, 205 P.3d 134 (2009), Division Three held that a railroad tie retaining wall that extended into the beach area of the disputed property was not a certain, well-defined boundary line. The court pointed out that there were no monuments, roadways, fence lines, physical designations, improvements, or encroachments along the boundary line. *Green*, 149 Wn. App. at 643-44; *see also Scott v. Slater*, 42 Wn.2d 366, 367-68, 255 P.2d 377 (1953) (no well-defined line when there had never been a fence or point to which the ground was cultivated, even though there was a row of pear trees along the line), *overruled on other grounds by Chaplin v. Sanders*, 100 Wn.2d 853, 862 n.2, 676 P.2d 431 (1984).

¶43 Here, the majority places too much weight on the fact that there were some physical boundary line markers (two wooden poles and a stake), failing to recognize that along with a physical monument, the boundary line must *also* be

" 'certain' " and " 'well defined.' " *Lilly*, 88 Wn. App. at 316 (quoting *Lamm*, 72 Wn.2d at 593). The trial court reviewed the photographic exhibits of the disputed property boundary and found that there was not a well-defined line or boundary between the two parcels for a long period of years because of vegetation overgrowth. The trial court noted that the boundary was covered by an overgrowth of blackberries, ivy, and weeds from 1993 to 2002, a finding the Merrimans do not challenge. I agree with the trial court that a certain, well-defined boundary line is not apparent from the existence of only two wooden poles and a stake when the boundary line is covered with foliage and underbrush overgrowth. Because the Merrimans have not shown a well-defined, certain boundary line by clear and convincing evidence, I would affirm the trial court's decision that the Merrimans did not acquire the property by acquiescence.